UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No._____ |
| ) | |
| CCM TCEP, LLC, and ) | |
| SUMMIT POWER GROUP, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

The United States of America, on behalf of the U.S. Department of Energy ("Energy"), brings this action for monies owed to Energy by defendant CCM TCEP, LLC ("CCM") and defendant Summit Power Group, LLC ("SPG") (collectively, the "Guarantors") and alleges:

## NATURE OF THE CASE

1. This breach of contract case arises from the Guarantors' refusal to honor guaranties each made to Energy to induce the agency to continue supporting a Clean Coal Power Initiative ("Clean Coal") project with federal award recipient Summit Texas Clean Energy, LLC ("Summit"). Collectively, the Guarantors agreed to pay Energy $13.8 million if Summit failed to complete the first phase of the project and then failed to repay a portion of Energy's funding. Summit did not complete the first phase of the project, nor did Summit make the requisite repayment. When Energy issued its demand to the Guarantors to make good on their promises to pay, they each refused to do so. Energy now seeks $13.8 million in damages for the Guarantors' breach of their financial obligations.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1345.

3. Venue is proper in the District of Delaware under 28 U.S.C. § 1391 because the defendants are incorporated in Delaware.

## PARTIES

4. Plaintiff United States of America is suing on behalf of Energy.

5. Defendant CCM is a Delaware limited liability company.

6. Defendant SPG is a Delaware limited liability company.

## FACTUAL ALLEGATIONS

### I. The Clean Coal Power Initiative

7. The United States, acting through Energy, initiated Clean Coal in 2002 to enable and accelerate the deployment of advanced technologies to ensure clean, reliable, and affordable electricity for the United States. Energy pursued this objective through cooperative agreements with private commercial entities.

8. All Clean Coal projects were subject to technical requirements of the Energy Policy Act of 2005 ("EPAct"). P.L. 109-58 § 401 *et seq*. (codified at 42 U.S.C. §§ 15961-65.). Under the EPAct, the Secretary of Energy "shall establish a reasonable period of time during which the owner or operator of the project shall complete the construction or demonstration phase of the project, as the Secretary determines to be appropriate." 42 U.S.C. § 15962(f)(1).

9. The Secretary of Energy—in her "sole discretion"—may extend the time to complete a Clean Coal project. *Id.* § 15962(f)(2). But "the Secretary shall not extend a time

period" for the construction or the demonstration phase of a project "by more than four years." *Id.* § 15962(f)(3).

10.  The American Recovery and Reinvestment Act of 2009 ("Recovery Act") increased funding for Clean Coal projects, providing $3.4 billion for "Fossil Energy Research and Development." P.L. 111-5, Tit. IV.  Congress passed the Recovery Act, among other reasons, to "invest in transportation, environmental protection, and other infrastructure that will provide long-term economic benefits," which investments are to be expedited, but must be consistent with "prudent management." *Id.* § 3(a)(4), (b).

**II.  The Cooperative Agreement**

11.  After enactment of the Recovery Act, Energy solicited further Clean Coal projects and approved an application submitted by Summit, a Seattle-based company focused on designing and developing power production plants.

12.  On January 29, 2010, Energy and Summit entered into an agreement ("Cooperative Agreement") to build a facility that would capture and sequester, or otherwise put to beneficial use, 90 percent of the carbon dioxide generated by a coal-fired power plant.  *See* Exhibit 1 (Cooperative Agreement).

13.  The Cooperative Agreement established a collaboration between Energy and Summit.  Under the agreement, Energy would "monitor [Summit's] progress in performing the project" and "have a substantial role in project decision making." *Id.* at 7.  Summit, on the other hand, would be responsible for "all aspects of project performance as set forth in this Cooperative Agreement and the Statement of Project Objectives." *Id.* at 6.

14.  The total project was initially projected to cost over $1.726 billion, with Energy contributing $350 million and Summit responsible for the balance of over $1.376 billion.  *Id.*

at 1. Neither party was immediately responsible for its entire financial contribution. Instead, the Cooperative Agreement allocated the financial obligations of each party across four phases on the following schedule:

| Phases | Start Date | End Date | Energy Share | Summit Share |
|---|---|---|---|---|
| Phase 1 – Project Definition, Front End Engineering Design (FEED), Completion, and Record of Decision (ROD) Approval | 2/1/2010 | 12/31/2010 | ~ $15M | ~ $15M |
| Phase 2 – Design | 1/1/2011 | 12/31/2011 | ~ $193M | ~ $193M |
| Phase 3 – Construction | 1/1/2012 | 6/30/2014 | ~ $139M | ~ $1.17B |
| Phase 4 – Demonstration | 7/1/2014 | 7/15/2017 | ~ $2.9M | ~ $2.9M |
| **TOTAL** | | | **~ $350M** | **~ $1.376B** |

*Id.* at 5, 7.

15. The Cooperative Agreement required Summit to complete Phase 1 by December 31, 2010. "The overall objective of Phase 1 . . . [was] to refine and make final decisions associated with the technology, schedule, and costs baselines sufficient to reach financial close and enter the design phase." *Id.* at 46.

16. By the end of Phase 1, Energy expected Summit to achieve "financial close," meaning that Summit would secure firm commitments from lenders and investors to provide all of the non-federal funding needed to complete the project. *Id.* at 46. Energy agreed to contribute approximately $15 million to Phase 1. *Id.* at 6.

17. Energy did not guarantee it would fund each phase. Rather, the Cooperative Agreement required Summit to submit a "Decision Point Application"—90 days before the end of each phase—that "shall include . . . [a] report on the progress towards meeting the objectives of the project, . . . [and] detailed budget and supporting justification for the upcoming phase if additional funds are requested." *Id.* at 28.

18. Energy's "decision to proceed into subsequent Phases [was to] be based on [Energy's] review of the technical accomplishments of the preceding work, programmatic changes and/or the availability of funding in the [Clean Coal] Program." *Id.* at 28.

19. Energy alone could decide whether to move forward with each phase. At each "Decision Point," Energy would determine—in its "sole discretion"— whether continuing with the project was "advantageous to the Government." *Id.* "Work on a subsequent Phase shall not begin in the absence of written approval by the Contracting Officer." *Id.* If Energy did not provide a "favorable determination," the Cooperative Agreement would "be considered complete at the Decision Point." *Id.*

### III.   The Guarantors' Payment Agreements

20. Phase 1 of the project did not progress according to the original schedule or budget set forth in the Cooperative Agreement.

21. In August 2010, seven months after the project began, Energy issued three modifications to the Cooperative Agreement. First, Energy agreed to advance more than $8 million from Phase 2 to Phase 1 and to extend the deadline to begin Phase 2 by eight months, from January 2011 to September 2011. Second, Energy increased its total contribution by $100 million, for a new total of $450 million, while decreasing Summit's share of the total project cost by $100 million.

22. The third modification in August 2010 allowed Summit to request "accelerated reimbursement" of an additional 30% of project costs beyond Energy's 50% contribution to Phase 1 costs. *See* Exhibit 2, at 3 (Modification 6). To the extent Summit received accelerated reimbursements early in the project, Energy would reimburse Summit at a lower rate in later phases to balance the cost-sharing consistent with the overall project budget. *Id.* But if the

project was terminated or discontinued, Summit would be obligated to refund Energy the amount of funds that exceeded the cost-share percentage at the time of discontinuance (the "True Up Amount"). *Id.*

23. In June 2011, three months before the extant Phase 1 deadline, Energy agreed to give Summit until December 31, 2011 to complete Phase 1. Just two months later, as part of the eighth modification to the Cooperative Agreement, Energy agreed to advance another $7 million from Phase 2 to Phase 1. Thus, Energy's 50% cost share for Phase 1 had doubled from $15 million in January 2010 to $30 million in August 2011.

24. With the project approaching the Phase 1 deadline of December 31, 2011, both Energy and Summit wanted the project to continue. But Summit was not in a position to timely complete Phase 1. And Energy was concerned that Summit could not meet its obligation—if the project ended—to repay the True Up Amount, which had reached $16,215,075. While Summit and Energy worked to resolve those issues, Energy extended the Phase 1 deadline five times between the end of 2011 and mid-February 2012. Meanwhile, Summit agreed to secure the repayment of the True Up Amount and Energy agreed to continue supporting the project.

25. To secure repayment, Summit engaged CCM and SPG to enter into separate guaranties, each titled a "Payment Agreement."

26. CCM's Payment Agreement, dated March 5, 2012, committed CCM to deposit $6 million into a "Collateral Account" and to "direct the disbursement of funds" from that account to Energy if the Cooperative Agreement was "discontinued by [Energy] pursuant to the Decision Point Application Process for failure to achieve the technical objectives for Phase 1, provided that Summit shall be afforded the right to appeal or seek hearing of such final determination as permitted by 10 CFR 600.22 and 600.353." Exhibit 3, at 1-2.

27. SPG entered into two Payment Agreements, one dated February 15, 2012 and one dated March 19, 2012.  Together, these agreements committed SPG to repay a total of $7.8 million ($1.8 million immediately and $6 million in ten quarterly installments) if the Cooperative Agreement was "discontinued by [Energy] pursuant to the Decision Point Application Process for failure to achieve the technical objectives for Phase 1."  Exhibit 4, at 1-2; Exhibit 5, at 1-2.

28. Additional security totaling $2,415,075 was provided by subordinating another entity's claims to Energy's, but that security was released in 2014.

29. Modifications 14 and 15 of the Cooperative Agreement incorporated the Payment Agreements and described them as "tranches of security."  Exhibit 6, at 3 (Modification 14); Exhibit 7, at 3 (Modification 15).

30. Modification 15 also extended the Phase 1 deadline to September 30, 2012. Exhibit 7, at 4.

IV. **Energy's Decision to Discontinue the Cooperative Agreement**

31. Over six years—from 2010 to 2016—Summit repeatedly asked Energy to modify the Cooperative Agreement by moving funding allocated for Phase 2 to Phase 1 and extending the original Phase 1 deadline.

32. In total, Energy issued forty-three modifications of the Cooperative Agreement.

33. By the end of December 2015, Energy had paid $104,076,708 to Summit to complete Phase 1 of the project—$89 million more than the $15 million Energy originally agreed to fund for Phase 1 when the Cooperative Agreement was executed in January 2010. Exhibit 8, at 4 (Modification 36); Exhibit 1, at 7 (Cooperative Agreement).

34. Energy also extended the deadline to complete Phase 1 twenty-three times—more than five years beyond the original deadline—with a final extension to July 14, 2016.

35. On June 10, 2016, Energy sent a letter to Summit, copying CCM and SPG, stating: "[Energy] intends to issue its final determination to discontinue the cooperative agreement on July 14, 2016, if Summit does not provide [Energy] with: (1) firm commitments from lenders and investors sufficient to finance the entire project beyond phase 1; and (2) a complete decision point application as required by the cooperative agreement.  Summit's recent statements indicate that it is unlikely to provide these items within the time allowed."

36. Summit failed to submit the requisite Decision Point Application—which was required to evidence firm commitments from lenders and/or investors supporting Summit's cost share of the project—by the July 14, 2016 deadline.  Summit thus failed to complete the outstanding technical objectives of Phase 1 under the Cooperative Agreement.

37. Energy and Summit engaged in informal dispute resolution via telephone calls, emails, and meetings through August 22, 2016.  The parties did not resolve their dispute during this time.

38. Energy then discontinued the Cooperative Agreement on August 23, 2016.  *See* Exhibit 9 (Energy letter to Summit).

39. Summit appealed Energy's decision to Energy's Office of Acquisition Management on September 23, 2016.  The office denied Summit's appeal on December 20, 2016, in part because Summit "d[id] not dispute its failure to achieve the Phase 1 technical objectives." Exhibit 10, at 1-2.  That failure prevented Summit from submitting a Decision Point Application and allowed Energy to discontinue the Cooperative Agreement.

## V. The Guarantors' Refusal to Pay the $13.8 Million Guaranty

40. On December 22, 2016, Energy issued letters to Summit and the Guarantors, notifying each of its respective repayment obligations. Exhibits 11, 12, 13. Energy further notified CCM that it had to release the $6 million in the segregated deposit fund to Energy "within 30 days of the date of a final, non-appealable decision should [Summit] fail to satisfy its liability under the cooperative agreement." Exhibit 12.

41. Summit did not repay the $13.8 million.

42. The United States sent its final demand for payment to the Guarantors on May 24, 2021. Exhibits 14, 15.

43. The Guarantors still refuse to meet their guaranty obligations, and the United States, on behalf of Energy, seeks $13.8 million in damages plus any pre- and post-judgment interest allowed by law.

## COUNT I:
## Breach of Contract Claim against CCM TCEP, LLC

44. The United States incorporates by reference the allegations in the preceding paragraphs.

45. The United States, acting through Energy, entered a written Payment Agreement with CCM on March 5, 2012. Exhibit 3. The agreement obligated CCM to release $6 million from a designated "Collateral Account" if Energy discontinued the Cooperative Agreement "for [Summit's] failure to achieve the technical objectives for Phase 1," and Summit failed to repay the $13.8 million. *Id.* at 1-2.

46. On August 23, 2016, Energy issued its final determination to discontinue the Cooperative Agreement for Summit's "failure to achieve the technical objectives for phase 1."

47. Summit appealed that decision and lost.

48. On December 22, 2016, Energy issued a demand for payment to Summit, and the agency informed CCM that it would be required to release the $6 million from the Collateral Account within 30 days if Summit did not pay immediately.

49. Summit did not make the requisite $13.8 million payment, and CCM's guaranty obligations became due.

50. The United States sent a final demand for payment to CCM on May 24, 2021. Exhibit 14.

51. CCM breached its Payment Agreement by failing to satisfy its guaranty obligations, and the United States has suffered damages in the amount of $6 million, plus interest, penalties, fees, and costs, as applicable under 31 U.S.C. § 3717 and 31 C.F.R. § 901.9.

## COUNT II:
### Breach of Contract Claim against Summit Power Group, LLC

52. The United States incorporates by reference the factual allegations in the preceding paragraphs.

53. The United States, acting through Energy, entered written Payment Agreements with SPG on February 15, 2012 and March 19, 2012. Exhibits 4 and 5. The agreements obligated SPG to pay a total of $7.8 million if Energy discontinued the Cooperative Agreement "for [Summit's] failure to achieve the technical objectives for Phase 1," and Summit failed to repay the $13.8 million. Exhibit 4, at 1-2; Exhibit 5, at 1-2.

54. On August 23, 2016, Energy issued its final determination to discontinue the Cooperative Agreement for Summit's "failure to achieve the technical objectives for phase 1."

55. Summit appealed that decision and lost.

56. On December 22, 2016, Energy issued a demand for payment to Summit, and the agency informed SPG that it would be required to pay the $7.8 million within 30 days if Summit did not pay immediately.

57. Summit did not make the requisite $13.8 million payment, and SPG's guaranty obligations became due.

58. The United States sent a final demand for payment to SPG on May 24, 2021. Exhibit 15.

59. SPG breached its Payment Agreements by failing to meet its guaranty obligations, and the United States has suffered damages in the amount of $7.8 million, plus interest, penalties, fees, and costs, as applicable under 31 U.S.C. § 3717 and 31 C.F.R. § 901.9.

## PRAYER FOR RELIEF

60. Wherefore, the United States prays for the following relief against defendant CCM:

   a. Judgment for the damages that Energy sustained as a result of the breach of CCM's Payment Agreement;

   b. Damages sufficient to pay CCM's guaranty obligations, plus all unpaid accrued interest, fees, penalties, and costs through the date of judgment, to the extent applicable under 31 U.S.C. § 3717 and 31 C.F.R. § 901.9;

   c. All post-judgment interest that accrues until the obligation under CCM's Payment Agreement is satisfied; and

   d. Such other or further relief as the Court deems just and appropriate.

61. Wherefore, the United States prays for the following relief against defendant SPG:

   a. Judgment for the damages that Energy sustained as a result of the breach of SPG's Payment Agreements;

   b. Damages sufficient to pay SPG's guaranty obligations, plus all unpaid accrued interest, fees, penalties, and costs through the date of judgment, to the extent applicable under 31 U.S.C. § 3717 and 31 C.F.R. § 901.9;

   c. All post-judgment interest that accrues until the obligations under SPG's Payment Agreements are satisfied; and

   d. Such other or further relief as the Court deems just and appropriate.

Dated:  October 18, 2021                    Respectfully submitted,

BRIAN BOYNTON
Acting Assistant Attorney General

DAVID C. WEISS
United States Attorney
District of Delaware

/s/ John R. Kresse
RUTH A. HARVEY
MICHAEL J. QUINN
JOHN R. KRESSE
TIFFINEY CARNEY
United States Department of Justice
Civil Division, Commercial Litigation Branch
P.O. Box 875, Ben Franklin Station
Washington, DC  20044-0875
(202) 598-3811
john.kresse@usdoj.gov

*Attorneys for the United States*