# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

CCM TCEP, LLC, and SUMMIT POWER
GROUP, LLC,

                Defendants.

C.A. No. 1:21-cv-01461-LPS

## DEFENDANT CCM TCEP LLC'S ANSWER,
## AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendant CCM TCEP, LLC ("CCM") hereby answers and responds and asserts affirmative defenses to the Complaint of Plaintiff United States of America, and asserts its counterclaims as follows:

### ANSWER

### COMPLAINT

The United States of America, on behalf of the U.S. Department of Energy ("Energy"), brings this action for monies owed to Energy by defendant CCM TCEP, LLC ("CCM") and defendant Summit Power Group, LLC ("SPG") (collectively, the "Guarantors") and alleges:

**Response to Prefatory Paragraph:**

**The prefatory paragraph states legal conclusions to which no response is required.**

**To the extent a response is required, CCM denies all allegations in the prefatory paragraph.**

**CCM specifically denies that monies are owed by CCM and SPG ("Payors") to the U.S. Department of Energy ("DOE").**

## NATURE OF THE CASE

1.      This breach of contract case arises from the Guarantors' refusal to honor guaranties each made to Energy to induce the agency to continue supporting a Clean Coal Power Initiative ("Clean Coal") project with federal award recipient Summit Texas Clean Energy, LLC ("Summit"). Collectively, the Guarantors agreed to pay Energy $13.8 million if Summit failed to complete the first phase of the project and then failed to repay a portion of Energy's funding. Summit did not complete the first phase of the project, nor did Summit make the requisite repayment. When Energy issued its demand to the Guarantors to make good on their promises to pay, they each refused to do so. Energy now seeks $13.8 million in damages for the Guarantors' breach of their financial obligations.

**Response to Paragraph 1**:

**CCM admits that DOE seeks $13.8 million in damages ($6 million from CCM and $7.8 million from SPG) and admits that CCM did not issue payment in response to DOE's demands but denies the remaining allegations in Paragraph 1.  CCM specifically denies that monies were owed by Payors or that Summit Texas Clean Energy, LLC ("STCE") "induced" DOE to continue supporting the project.  CCM also specifically denies that STCE "failed" to complete the first phase of the project because DOE killed the project before performance was due.**

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this civil action under 28 U.S.C. § 1345.

**Response to Paragraph 2**

**Paragraph 2 states legal conclusions to which no response is required.  To the extent a response is required, CCM admits that the Court has subject matter jurisdiction over the claims alleged in the Complaint but denies the merit of DOE's suit.**

3.      Venue is proper in the District of Delaware under 28 U.S.C. § 1391 because the defendants are incorporated in Delaware.

**Response to Paragraph 3**

**Paragraph 3 states legal conclusions to which no response is required. To the extent a response is required, CCM admits Paragraph 3.**

<u>PARTIES</u>

4.      Plaintiff United States of America is suing on behalf of Energy.

**Response to Paragraph 4**:

**The allegations in Paragraph 4 are not directed to CCM and therefore no response from CCM is required. To the extent a response is required, CCM admits the United States is suing on behalf of DOE but denies the merit of DOE's suit.**

5.      Defendant CCM is a Delaware limited liability company.

**Response to Paragraph 5**:

**CCM admits that it is a Delaware limited liability company.**

6.      Defendant SPG is a Delaware limited liability company.

**Response to Paragraph 6**:

**The allegations in Paragraph 6 are not directed to CCM and therefore no response from CCM is required. To the extent a response is required, CCM admits that in the Payment Agreement dated February 15, 2012, SPG is described as a "Delaware limited liability company."**

<u>FACTUAL ALLEGATIONS</u>

I.      The Clean Coal Power Initiative

7.      The United States, acting through Energy, initiated Clean Coal in 2002 to enable and accelerate the deployment of advanced technologies to ensure clean, reliable, and affordable electricity for the United States. Energy pursued this objective through cooperative agreements with private commercial entities.

**Response to Paragraph 7**:

**The allegations in Paragraph 7 are not directed to CCM and therefore no response from CCM is required. To the extent a response is required, CCM admits the first sentence of Paragraph 7. CCM lacks sufficient knowledge or information to form a belief as to the other allegations in Paragraph 7 and therefore denies them.**

8.      All Clean Coal projects were subject to technical requirements of the Energy Policy Act of 2005 ("EPAct"). P.L. 109-58 § 401 et seq. (codified at 42 U.S.C. §§ 15961-65.). Under the EPAct, the Secretary of Energy "shall establish a reasonable period of time during which the owner or operator of the project shall complete the construction or demonstration phase of the project, as the Secretary determines to be appropriate." 42 U.S.C. § 15962(f)(1).

**Response to Paragraph 8**:

**The allegations in Paragraph 8 contains legal conclusions and characterizations, and are not directed to CCM, and therefore no response from CCM is required. To the extent a response is required, CCM is without sufficient knowledge or information to form a belief as to the allegations in the first sentence of Paragraph 8 and therefore denies them. CCM admits that 42 U.S.C. § 15962(f)(1) contains the above quoted language but denies that the project was in a construction or demonstration phase.**

9.      The Secretary of Energy—in her "sole discretion"—may extend the time to complete a Clean Coal project. *Id.* § 15962(f)(2). But "the Secretary shall not extend a time period" for the construction or the demonstration phase of a project "by more than four years." *Id.* § 15962(f)(3).

**Response to Paragraph 9**:

**The allegations in Paragraph 9 contain legal conclusions and characterizations, and are not directed to CCM, and therefore no response from CCM is required. To the extent a response is required, CCM denies that 42 U.S.C. § 15962(f)(2) contains the above quoted language. CCM admits that 42 U.S.C. § 15962(f)(3) contains the above quoted language, but denies that the project was in a construction or demonstration phase.**

4

10.     The American Recovery and Reinvestment Act of 2009 ("Recovery Act") increased funding for Clean Coal projects, providing $3.4 billion for "Fossil Energy Research and Development." P.L. 111-5, Tit. IV. Congress passed the Recovery Act, among other reasons, to "invest in transportation, environmental protection, and other infrastructure that will provide long-term economic benefits," which investments are to be expedited, but must be consistent with "prudent management." Id. § 3(a)(4), (b).

**Response to Paragraph 10**:

**The allegations in Paragraph 10 contains legal conclusions and characterizations, and are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits the first sentence of Paragraph 10. CCM admits that the above quoted language appears in the statute, but denies the remainder of the allegations of Paragraph 10 to the extent it is incomplete and/or inconsistent with the statute.**

II.     The Cooperative Agreement

11.     After enactment of the Recovery Act, Energy solicited further Clean Coal projects and approved an application submitted by Summit, a Seattle-based company focused on designing and developing power production plants.

**Response to Paragraph 11**:

**The allegations in Paragraph 11 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that STCE submitted an application in 2009, but CCM is without sufficient knowledge or information to form a belief as to the allegations in Paragraph 11 and therefore denies them.**

12.     On January 29, 2010, Energy and Summit entered into an agreement ("Cooperative Agreement") to build a facility that would capture and sequester, or otherwise put to beneficial use, 90 percent of the carbon dioxide generated by a coal-fired power plant. See Exhibit 1 (Cooperative Agreement).

**Response to Paragraph 12**:

**The allegations in Paragraph 12 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that the effective**

date of Cooperative Agreement DE-FE0002650 was January 29, 2010, and that the objective

of the project was to demonstrate the integration of a commercial electric power generating

plant with $CO_2$ capture, transportation and geologic sequestration.   CCM admits that

performance targets of the Texas Clean Energy Project included "Capture and sequester, or

put to beneficial use, a minimum of 300,000 tons per year of $CO_2$ emissions as measured

using a thirty day running average," and "Achieve a minimum 50% $CO_2$ capture efficiency

and make progress toward a target $CO_2$ capture efficiency of 90% in a gas stream containing

at least 10% $CO_2$ by volume[.]"   CCM denies the remaining allegations in Paragraph 12.

13.    The Cooperative Agreement established a collaboration between Energy and
Summit. Under the agreement, Energy would "monitor [Summit's] progress in performing the
project" and "have a substantial role in project decision making." *Id*. at 7. Summit, on the other
hand, would be responsible for "all aspects of project performance as set forth in this Cooperative
Agreement and the Statement of Project Objectives." *Id*. at 6.

## Response to Paragraph 13:

The allegations in Paragraph 13 are not directed to CCM, and therefore no response

from CCM is required.  To the extent a response is required, CCM admits that DOE was

required to collaborate and share responsibility for management of the project with STCE,

including a requirement that DOE collaborate with STCE on project planning and technical

progress.  CCM admits that one of DOE's responsibilities under the Cooperative Agreement

was to "monitor the Recipient's progress in performing the project" and have a "substantial

role in project decision making," but denies that those were the extent of DOE's

responsibilities under the Cooperative Agreement.  DOE had other responsibilities, *inter*

*alia*: "collaborate and share responsibility for the management of the project,"

"[s]ubstantial and direct operational involvement or participation," "[p]romoting and

facilitating technology transfer activities," "[s]erving as a scientific/technical liaison between

awardees and other program or industry staff," and "[r]eviewing and concurring with ongoing technical performance to ensure that adequate progress has been obtained…before work can commence on subsequent phases[.]"  DOE also was required to "exercise normal Federal stewardship in overseeing the project activities," including "providing technical assistance and/or temporary intervention in unusual circumstances to correct deficiencies which develop during the project."   CCM denies that DOE adequately satisfied its responsibilities under the Cooperative Agreement.  CCM admits that STCE was responsible for project performance set forth in the Cooperative Agreement and the Statement of Project Objectives, subject to DOE's role in operational decision making, planning, and approval. CCM denies the remaining allegations in Paragraph 13.

14.    The total project was initially projected to cost over $1.726 billion, with Energy contributing $350 million and Summit responsible for the balance of over $1.376 billion. *Id.* at 1. Neither party was immediately responsible for its entire financial contribution. Instead, the Cooperative Agreement allocated the financial obligations of each party across four phases on the following schedule:

| Phases | Start Date | End Date | Energy Share | Summit Share |
|---|---|---|---|---|
| Phase 1 – Project Definition, Front End Engineering Design (FEED), Completion, and Record of Decision (ROD) Approval | 2/1/2010 | 12/31/2010 | ~ $15M | ~ $15M |
| Phase 2 – Design | 1/1/2011 | 12/31/2011 | ~ $193M | ~ $193M |
| Phase 3 – Construction | 1/1/2012 | 6/30/2014 | ~ $139M | ~ $1.17B |
| Phase 4 – Demonstration | 7/1/2014 | 7/15/2017 | ~ $2.9M | ~ $2.9M |
| **TOTAL** | | | **~ $350M** | **~ $1.376B** |

*Id.* at 5, 7.

<u>**Response to Paragraph 14**</u>:

The allegations in Paragraph 14 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that on January 29, 2010 the total amount of Award No. DE-FE0002650 was $1,726,628,229.00, and that the

Government's share was $350,000,000.00 and the Cost Share was $1,376,628,229.00.  CCM denies that this was the "initially projected" cost, as DOE rejected the originally proposed budget, which the Cooperative Agreement notes: "The amounts identified herein for estimated costs differ significantly from the estimated costs contained in the Recipient's initial application."  CCM denies that DOE committed to contribute $350 million; DOE had obligated only $215,598,000.00 for funding of the project.  CCM admits the second sentence of Paragraph 14.  CCM admits that the project was to proceed in phases but denies that the above table appears in the Cooperative Agreement.  The correct table in the Cooperative Agreement is set forth below:

| Phase No. | Phase Start Date | Government Share $ / % | Recipient Share $ / % | Total Estimated Cost |
|---|---|---|---|---|
| Phase 1- Project Definition, Front End Engineering Design (FEED) Completion, and Record of Decision (ROD) Approval | 02/01/2010 | $15,001,312/50% | $15,001,312/50% | $30,002,624 |
| Phase 2- Design | 01/01/2011 | $192,985,594/50% | $192,985,594/50% | $385,971,188 |
| Phase 3- Construction | 01/01/2012 | $139,104,471/10.66% | $1,165,732,700/89.34% | $1,304,837,171 |
| Phase 4- Demonstration/ Operation | 07/01/2014 | $2,908,623/50% | $2,908,623/50% | $5,817,246 |
| Total Estimated Project Cost | | $350,000,000/20.27% | $1,376,628,229/79.73% | $1,726,628,229 |

CCM denies that there was an agreement as to the costs of these phases as of January 29, 2010, as the Cooperative Agreement noted that all of these above costs were subject to negotiation, definitization, or adjustment at a later date.

15.    The Cooperative Agreement required Summit to complete Phase 1 by December 31, 2010. "The overall objective of Phase 1 . . . [was] to refine and make final decisions associated with the technology, schedule, and costs baselines sufficient to reach financial close and enter the design phase." *Id*. at 46.

**Response to Paragraph 15**:

**The allegations in Paragraph 15 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM denies that STCE was required to complete Phase 1 by December 31, 2010.  CCM admits the Cooperative Agreement contains the above quoted language in the second sentence of Paragraph 15.**

16.     By the end of Phase 1, Energy expected Summit to achieve "financial close," meaning that Summit would secure firm commitments from lenders and investors to provide all of the non-federal funding needed to complete the project. *Id*. at 46. Energy agreed to contribute approximately $15 million to Phase 1. *Id*. at 6.

**Response to Paragraph 16**:

**The allegations in Paragraph 16 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM is without sufficient knowledge or information to form a belief as to the expectations of DOE and therefore denies the first sentence of Paragraph 16.  CCM admits that the Cooperative Agreement's objectives for Phase 1 included "[s]oliciting equity investors, and acquiring commitments for financing of the entire project beyond Phase 1," after other tasks like developing a project plan, conducting a FEED study, satisfying NEPA and accomplishing major permitting efforts, and filing for an interconnect request.  CCM admits that as of January 29, 2010, $15,001,312.00 was made available based on a preliminary estimate of the Phase 1 costs that DOE agreed was subject to negotiation, definitization, and adjustment.  CCM denies that DOE agreed to contribute this amount without first approving the Phase 1 cost estimate (which DOE subsequently increased) and STCE's satisfaction of additional conditions.**

17.     Energy did not guarantee it would fund each phase. Rather, the Cooperative Agreement required Summit to submit a "Decision Point Application"—90 days before the end of each phase—that "shall include . . . [a] report on the progress towards meeting the objectives of the project, . . . [and] detailed budget and supporting justification for the upcoming phase if additional funds are requested." *Id*. at 28.

**Response to Paragraph 17**:

**The allegations in Paragraph 17 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits the first sentence of Paragraph 17.  CCM denies the second sentence of Paragraph 17 to the extent it is attempts to paraphrase or characterize the contents of a written document—the document speaks for itself.**

18.     Energy's "decision to proceed into subsequent Phases [was to] be based on [Energy's] review of the technical accomplishments of the preceding work, programmatic changes and/or the availability of funding in the [Clean Coal] Program." *Id*. at 28.

**Response to Paragraph 18**:

**The allegations in Paragraph 18 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, the document speaks for itself and CCM denies the allegations to the extent they are inconsistent with the content of the document.**

19.     Energy alone could decide whether to move forward with each phase. At each "Decision Point," Energy would determine—in its "sole discretion"— whether continuing with the project was "advantageous to the Government." *Id*. "Work on a subsequent Phase shall not begin in the absence of written approval by the Contracting Officer." *Id*. If Energy did not provide a "favorable determination," the Cooperative Agreement would "be considered complete at the Decision Point." *Id*.

**Response to Paragraph 19**:

**The allegations in Paragraph 19 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, the document speaks for itself and CCM denies the allegations in Paragraph 19 to the extent they are inconsistent with the content of the document.**

III.     The Guarantors' Payment Agreements

20.     Phase 1 of the project did not progress according to the original schedule or budget set forth in the Cooperative Agreement.

**Response to Paragraph 20**:

**The allegations in Paragraph 20 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM denies Paragraph 20 to the extent it is incomplete and does not acknowledge that (1) DOE modified the schedule multiple times, and (2) one of the tasks under Phase 1 was to "refine the schedule and set the baseline…taking into account Recovery Act schedule requirements, the final demonstration configuration, and selected major equipment, as well as the expected lead time for the major equipment and the overall project" and "other aspects of the schedule," including cost estimates and financing.  CCM denies that, as of January 29, 2010, there was an agreed upon budget for any phase of the project, since the cost estimates were subject to negotiation, definitization, and adjustment at a later date.**

21.     In August 2010, seven months after the project began, Energy issued three modifications to the Cooperative Agreement. First, Energy agreed to advance more than $8 million from Phase 2 to Phase 1 and to extend the deadline to begin Phase 2 by eight months, from January 2011 to September 2011. Second, Energy increased its total contribution by $100 million, for a new total of $450 million, while decreasing Summit's share of the total project cost by $100 million.

**Response to Paragraph 21**:

**The allegations in Paragraph 21 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits the first sentence of Paragraph 21.  CCM denies the second sentence of Paragraph 21:  Modification 4, dated August 4, 2010, "reflect[s] the realigned budgets for Phase 1 and 2," increasing the estimated cost for Phase 1 from approximately $15 million to $23,196,764.00 for both DOE and STCE.**

11

**CCM admits that DOE modified the start date of Phase 2 from January 1, 2011 to September 1, 2011.  Regarding the third sentence of Paragraph 21, CCM admits that Modification 5, dated August 12, 2010, increased DOE's share of Phase 3 (construction) costs by $100,000,000, from approximately $139 million to approximately $239 million, with a corresponding decrease in STCE's share of Phase 3 costs, from approximately $1.165 billion to approximately $1.065 billion.  CCM denies the remaining allegations of Paragraph 21.**

22.    The third modification in August 2010 allowed Summit to request "accelerated reimbursement" of an additional 30% of project costs beyond Energy's 50% contribution to Phase 1 costs. See Exhibit 2, at 3 (Modification 6). To the extent Summit received accelerated reimbursements early in the project, Energy would reimburse Summit at a lower rate in later phases to balance the cost-sharing consistent with the overall project budget. *Id.* But if the project was terminated or discontinued, Summit would be obligated to refund Energy the amount of funds that exceeded the cost-share percentage at the time of discontinuance (the "True Up Amount"). *Id.*

**Response to Paragraph 22**:

**The allegations in Paragraph 22 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits the first sentence of Paragraph 22 to the extent that Modification 6, dated August 26, 2010, gave DOE the discretion to allow STCE to invoice DOE at an accelerated rate of up to 80% of the total allowable costs.  CCM denies the remaining allegations of the first sentence of Paragraph 22.  CCM admits the second and third sentences of Paragraph 22, but it denies that Modification 6 refers to a "True Up Amount."**

23.    In June 2011, three months before the extant Phase 1 deadline, Energy agreed to give Summit until December 31, 2011 to complete Phase 1. Just two months later, as part of the eighth modification to the Cooperative Agreement, Energy agreed to advance another $7 million from Phase 2 to Phase 1. Thus, Energy's 50% cost share for Phase 1 had doubled from $15 million in January 2010 to $30 million in August 2011.

**Response to Paragraph 23**:

**The allegations in Paragraph 23 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits the first sentence. DOE issued Modification 8 on June 6, 2011, "reflect[ing] updated Phase Start and End Dates," including an end date of December 31, 2011 for Phase 1.  CCM denies the second sentence of Paragraph 23, and specifically denies that DOE advanced money from Phase 2 to Phase 1: DOE issued Modification 9, dated August 3, 2011, reflecting its "negotiation and acceptance" of increased project cost estimates, which resulted in a $13,841,728 increase in Phase 1 project costs (to be shared by DOE and STCE equally as provided by the Cooperative Agreement) and a corresponding decrease of $ $13,841,728 in Phase 2 project costs.  CCM denies the third sentence of Paragraph 23 to the extent it suggests that DOE's cost share percentage increased, or that the dollar amount increased only for DOE and not for STCE.**

24.     With the project approaching the Phase 1 deadline of December 31, 2011, both Energy and Summit wanted the project to continue. But Summit was not in a position to timely complete Phase 1. And Energy was concerned that Summit could not meet its obligation—if the project ended—to repay the True Up Amount, which had reached $16,215,075. While Summit and Energy worked to resolve those issues, Energy extended the Phase 1 deadline five times between the end of 2011 and mid-February 2012. Meanwhile, Summit agreed to secure the repayment of the True Up Amount and Energy agreed to continue supporting the project.

**Response to Paragraph 24**:

**The allegations in Paragraph 24 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM lacks sufficient knowledge or information to form a belief as to the allegations in the first three sentences and the first clause of the fourth sentence of Paragraph 24 and therefore denies them.  As to the remainder**

of the fourth sentence, CCM admits that DOE issued five short-term, last-minute, no-cost extensions pushing the Phase 1 deadline through February 15, 2012, as follows:

- **Modification 10, issued on December 29, 2011, extended the deadline to January 6, 2012;**

- **Modification 11, issued January 6, 2012, extended the deadline to January 31, 2012;**

- **Modification 12, issued January 31, 2012, extended the deadline to February 7, 2012;**

- **Modification 13, issued February 7, 2012, extended the deadline to February 15, 2012; and**

- **Modification 14, issued February 15, 2012, extended the deadline to March 30, 2012 (or February 29, 2012 if the third tranche of security was not secured by that date).**

**CCM admits the fifth sentence of Paragraph 24 to the extent it is consistent with the terms of Modification 14.  CCM denies the remainder of Paragraph 24.**

25.     To secure repayment, Summit engaged CCM and SPG to enter into separate guaranties, each titled a "Payment Agreement."

**Response to Paragraph 25**:

**CCM admits that CCM and SPG entered into the separate "Payment Agreements."**

26.     CCM's Payment Agreement, dated March 5, 2012, committed CCM to deposit $6 million into a "Collateral Account" and to "direct the disbursement of funds" from that account to Energy if the Cooperative Agreement was "discontinued by [Energy] pursuant to the Decision Point Application Process for failure to achieve the technical objectives for Phase 1, provided that Summit shall be afforded the right to appeal or seek hearing of such final determination as permitted by 10 CFR 600.22 and 600.353." Exhibit 3, at 1-2.

**Response to Paragraph 26**:

**To the extent the allegations of Paragraph 26 seek to characterize or paraphrase the contents of a written document, the document speaks for itself and CCM denies the**

**allegations to the extent they are inconsistent with the contents of the document.  CCM denies**

**that CCM's obligation to pay DOE under the Payment Agreement was ever triggered.**

27.      SPG entered into two Payment Agreements, one dated February 15, 2012 and one dated March 19, 2012. Together, these agreements committed SPG to repay a total of $7.8 million ($1.8 million immediately and $6 million in ten quarterly installments) if the Cooperative Agreement was "discontinued by [Energy] pursuant to the Decision Point Application Process for failure to achieve the technical objectives for Phase 1." Exhibit 4, at 1-2; Exhibit 5, at 1-2.

<u>Response to Paragraph 27</u>:

**The allegations in Paragraph 27 are not directed to CCM and therefore no response**

**from CCM is required.  To the extent a response is required, CCM denies the allegations of**

**Paragraph 27 to the extent it attempts to paraphrase or characterize the contents of written**

**documents—the documents speak for themselves.  CCM denies that SPG's obligations to**

**pay DOE under the Payment Agreements were ever triggered.**

28.      Additional security totaling $2,415,075 was provided by subordinating another entity's claims to Energy's, but that security was released in 2014.

<u>Response to Paragraph 28</u>:

**The allegations in Paragraph 28 are not directed to CCM, and therefore no response**

**from CCM is required.  To the extent a response is required, CCM admits Paragraph 28.**

29.      Modifications 14 and 15 of the Cooperative Agreement incorporated the Payment Agreements and described them as "tranches of security." Exhibit 6, at 3 (Modification 14); Exhibit 7, at 3 (Modification 15).

<u>Response to Paragraph 29</u>:

**The allegations in Paragraph 29 are not directed to CCM, and therefore no response**

**from CCM is required.  To the extent a response is required, CCM admits Paragraph 29.**

30.      Modification 15 also extended the Phase 1 deadline to September 30, 2012. Exhibit 7, at 4.

**Response to Paragraph 30**:

  **The allegations in Paragraph 30 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that Modification 15 included a no-cost extension of the Phase 1 deadline to September 30, 2012.**

IV. Energy's Decision to Discontinue the Cooperative Agreement

  31. Over six years—from 2010 to 2016—Summit repeatedly asked Energy to modify the Cooperative Agreement by moving funding allocated for Phase 2 to Phase 1 and extending the original Phase 1 deadline.

**Response to Paragraph 31**:

  **The allegations in Paragraph 31 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that DOE approved realigned budgets and/or cost estimates for Phase 1 and Phase 2 and issued modifications, including administrative or unilateral modifications by DOE, extending the Phase 1 deadline at various times from 2010 to 2016.  CCM denies the remaining allegations in Paragraph 31 to the extent they are incomplete, misleading, or suggest that DOE made funding and scheduling decisions solely at the request of STCE.  CCM lacks sufficient knowledge or information to form a belief as to the remaining allegations in Paragraph 31 and therefore denies them.**

  32. In total, Energy issued forty-three modifications of the Cooperative Agreement.

**Response to Paragraph 32**:

  **The allegations in Paragraph 32 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that DOE issued at lease forty-three modifications of the Cooperative Agreement through August 2016.  No less than twenty-two of the modifications were administrative or unilateral modifications**

issued by DOE, including modifications related to American Recovery and Reinvestment Act sunsets and various short-term, no-cost extensions while DOE reviewed work as it was required to do under the Cooperative Agreement.

33. By the end of December 2015, Energy had paid $104,076,708 to Summit to complete Phase 1 of the project—$89 million more than the $15 million Energy originally agreed to fund for Phase 1 when the Cooperative Agreement was executed in January 2010. Exhibit 8, at 4 (Modification 36); Exhibit 1, at 7 (Cooperative Agreement).

**Response to Paragraph 33**:

The allegations in Paragraph 33 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that Modification 36, issued December 7, 2015, lists the Federal Share of the Phase 1 subtotal as $104,076,708, representing reimbursements to STCE for costs it incurred.  CCM denies that there was an agreement as to the costs of the phases as of January 29, 2010, as the Cooperative Agreement noted that all of the costs contained therein were subject to negotiation, definitization, or adjustment at a later date.  CCM lacks sufficient knowledge or information to form a belief as to the other allegations in Paragraph 33 and therefore denies them.

34. Energy also extended the deadline to complete Phase 1 twenty-three times—more than five years beyond the original deadline—with a final extension to July 14, 2016.

**Response to Paragraph 34**:

The allegations in Paragraph 34 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that DOE issued at least twenty-three modifications to the Phase 1 deadline and that Modification 42, issued June 20, 2016, purported to extend the deadline to July 14, 2016.  CCM denies the remainder of Paragraph 34, and specifically denies it to the extent it suggests that these twenty-three

extensions were at STCE's request and to the extent it suggests that as of January 29, 2010, there was a deadline to complete Phase 1.

35.     On June 10, 2016, Energy sent a letter to Summit, copying CCM and SPG, stating: "[Energy] intends to issue its final determination to discontinue the cooperative agreement on July 14, 2016, if Summit does not provide [Energy] with: (1) firm commitments from lenders and investors sufficient to finance the entire project beyond phase 1; and (2) a complete decision point application as required by the cooperative agreement. Summit's recent statements indicate that it is unlikely to provide these items within the time allowed."

**Response to Paragraph 35**:

**CCM admits that it received the letter referenced in Paragraph 35, but denies Paragraph 35 to the extent it is inconsistent with actions taken by DOE, including (1) issuing a FY2017 proposed budget, dated February 9, 2016, that contained a provision to "deobligate $240 million from [Clean Coal Power Initiative] projects that have not yet reached financial close," *i.e.* STCE, and (2) March 22, 2016 Congressional testimony from Secretary Ernest Moniz stating that "the program finally decided it was time to move on."**

36.     Summit failed to submit the requisite Decision Point Application—which was required to evidence firm commitments from lenders and/or investors supporting Summit's cost share of the project—by the July 14, 2016 deadline. Summit thus failed to complete the outstanding technical objectives of Phase 1 under the Cooperative Agreement.

**Response to Paragraph 36**:

**The allegations in Paragraph 36 are not directed to CCM, and therefore no response from CCM is required.   Additionally, Paragraph 36 states legal conclusions and characterizations to which no response is required.   To the extent a response is required, CCM admits that STCE did not submit a final Decision Point Application, but denies the remainder of Paragraph 36 and specifically denies that it was possible for STCE to secure firm commitments from lenders or investors following DOE's conduct undermining STCE's ability to perform under the Cooperative Agreement.**

37.     Energy and Summit engaged in informal dispute resolution via telephone calls, emails, and meetings through August 22, 2016. The parties did not resolve their dispute during this time.

**Response to Paragraph 37**:

**The allegations in Paragraph 37 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM lacks sufficient knowledge or information to form a belief as to the allegations in the first sentence of Paragraph 37 and therefore denies them.  CCM admits the second sentence of Paragraph 37.**

38.     Energy then discontinued the Cooperative Agreement on August 23, 2016. See Exhibit 9 (Energy letter to Summit).

**Response to Paragraph 38**:

**The allegations in Paragraph 38 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits that DOE issued a letter dated August 23, 2016 purporting to discontinue the Cooperative Agreement, but denies Paragraph 38 to the extent it is inconsistent with actions taken by DOE, including (1) issuing a FY2017 proposed budget, dated February 9, 2016, that contained a provision to "deobligate $240 million from [Clean Coal Power Initiative] projects that have not yet reached financial close," *i.e.* STCE, and (2) March 22, 2016 Congressional testimony from Secretary Ernest Moniz stating that "the program finally decided it was time to move on."**

39.     Summit appealed Energy's decision to Energy's Office of Acquisition Management on September 23, 2016. The office denied Summit's appeal on December 20, 2016, in part because Summit "d[id] not dispute its failure to achieve the Phase 1 technical objectives." Exhibit 10, at 1-2. That failure prevented Summit from submitting a Decision Point Application and allowed Energy to discontinue the Cooperative Agreement.

**Response to Paragraph 39**:

The allegations in Paragraph 39 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits the first sentence and denies the second and third sentences.

V.      The Guarantors' Refusal to Pay the $13.8 Million Guaranty

40.      On December 22, 2016, Energy issued letters to Summit and the Guarantors, notifying each of its respective repayment obligations. Exhibits 11, 12, 13. Energy further notified CCM that it had to release the $6 million in the segregated deposit fund to Energy "within 30 days of the date of a final, non-appealable decision should [Summit] fail to satisfy its liability under the cooperative agreement." Exhibit 12.

**Response to Paragraph 40**:

CCM admits that it received the letter dated December 22, 2016, but denies that it is obligated to make any payment or release any funds to DOE under the Payment Agreements. The remainder of Paragraph 40 are not directed to CCM and therefore no response from CCM is required.  To the extent a response is required, CCM is without sufficient knowledge or information to form a belief as to the allegations not directed toward CCM and therefore denies them.

41.      Summit did not repay the $13.8 million.

**Response to Paragraph 41**:

The allegations in Paragraph 41 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits Paragraph 41, on information and belief, to the extent that it alleges that STCE did not pay $13.8 million to DOE, but CCM denies it to the extent it is incomplete and fails to indicate that STCE filed a bankruptcy petition and DOE never filed a proof of claim seeking to recover any of the $13.8 million from STCE.

42.     The United States sent its final demand for payment to the Guarantors on May 24, 2021. Exhibits 14, 15.

**Response to Paragraph 42**:

**Portions of Paragraph 42 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM is without sufficient knowledge or information to form a belief as to the allegations of Paragraph 42 not directed to CCM, and therefore denies them.  CCM admits that it received the final demand for payment letter dated May 24, 2021.  CCM denies that it is obligated to make any payment under the Payment Agreements.**

43.     The Guarantors still refuse to meet their guaranty obligations, and the United States, on behalf of Energy, seeks $13.8 million in damages plus any pre- and post-judgment interest allowed by law.

**Response to Paragraph 43**:

**CCM denies the allegations in Paragraph 43, and specifically denies that it is obligated to make any payment under the Payment Agreements, or that the United States is entitled to pre- or post-judgment interest.**

Count I:
Breach of Contract Claim against CCM TCEP, LLC

44.     The United States incorporates by reference the allegations in the preceding paragraphs.

**Response to Paragraph 44**:

**CCM hereby incorporates by reference the responses to the allegations contained in the preceding paragraphs of this Answer.**

45.     The United States, acting through Energy, entered a written Payment Agreement with CCM on March 5, 2012. Exhibit 3. The agreement obligated CCM to release $6 million from a designated "Collateral Account" if Energy discontinued the Cooperative Agreement "for [Summit's] failure to achieve the technical objectives for Phase 1," and Summit failed to repay the $13.8 million. Id. at 1-2.

**Response to Paragraph 45**:

CCM admits the first sentence.  To the extent the second sentence of Paragraph 45 seeks to paraphrase or characterize the contents of the Payment Agreement, the document speaks for itself and CCM denies the allegations to the extent they are inconsistent with the document.  CCM denies that any money was owed to DOE by CCM.

46.     On August 23, 2016, Energy issued its final determination to discontinue the Cooperative Agreement for Summit's "failure to achieve the technical objectives for phase 1."

**Response to Paragraph 46**:

The allegations in Paragraph 46 are not directed to CCM, and therefore no response from CCM is required.  CCM denies Paragraph 46.

47.     Summit appealed that decision and lost.

**Response to Paragraph 47**:

The allegations in Paragraph 47 are not directed to CCM, and therefore no response from CCM is required.  CCM denies Paragraph 47.

48.     On December 22, 2016, Energy issued a demand for payment to Summit, and the agency informed CCM that it would be required to release the $6 million from the Collateral Account within 30 days if Summit did not pay immediately.

**Response to Paragraph 48**:

Portions of the allegations in Paragraph 48 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM is without sufficient knowledge or information to form a belief as to the allegations not directed toward CCM and therefore denies them.  CCM admits that it received the letter dated December 22, 2016, but CCM specifically denies that it is required to release any amount of money to DOE.

49.     Summit did not make the requisite $13.8 million payment, and CCM's guaranty obligations became due.

**Response to Paragraph 49**:

**The allegations in Paragraph 49 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM denies Paragraph 49, and specifically denies that any payment obligations became due.**

50.     The United States sent a final demand for payment to CCM on May 24, 2021. Exhibit 14.

**Response to Paragraph 50**:

**CCM admits that it received the final demand letter, but specifically denies that it is obligated to make any payments under the Payment Agreement.**

51.     CCM breached its Payment Agreement by failing to satisfy its guaranty obligations, and the United States has suffered damages in the amount of $6 million, plus interest, penalties, fees, and costs, as applicable under 31 U.S.C. § 3717 and 31 C.F.R. § 901.9.

**Response to Paragraph 51**:

**CCM denies Paragraph 51.**

Count II:
Breach of Contract Claim against Summit Power Group, LLC

52.     The United States incorporates by reference the factual allegations in the preceding paragraphs.

**Response to Paragraph 52**:

**CCM hereby incorporates by reference the responses to the allegations contained in the preceding paragraphs of this Answer.**

53.     The United States, acting through Energy, entered written Payment Agreements with SPG on February 15, 2012 and March 19, 2012. Exhibits 4 and 5. The agreements obligated SPG to pay a total of $7.8 million if Energy discontinued the Cooperative Agreement "for [Summit's] failure to achieve the technical objectives for Phase 1," and Summit failed to repay the $13.8 million. Exhibit 4, at 1-2; Exhibit 5, at 1-2.

**Response to Paragraph 53**:

**The allegations in Paragraph 53 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM admits the first sentence.  To the extent the second sentence of Paragraph 53 seeks to paraphrase or characterize the contents of the Payment Agreements, the documents speak for themselves and CCM denies the allegations to the extent they are inconsistent with the documents.  CCM denies any money was owed to DOE by SPG.**

54.     On August 23, 2016, Energy issued its final determination to discontinue the Cooperative Agreement for Summit's "failure to achieve the technical objectives for phase 1."

**Response to Paragraph 54**:

**The allegations in Paragraph 54 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM denies Paragraph 54.**

55.     Summit appealed that decision and lost.

**Response to Paragraph 55**:

**The allegations in Paragraph 55 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM denies Paragraph 55.**

56.     On December 22, 2016, Energy issued a demand for payment to Summit, and the agency informed SPG that it would be required to pay the $7.8 million within 30 days if Summit did not pay immediately.

**Response to Paragraph 56**:

**The allegations in Paragraph 56 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM is without sufficient knowledge or information to form a belief as to the allegations not directed toward CCM and therefore denies them.**

57.     Summit did not make the requisite $13.8 million payment, and SPG's guaranty obligations became due.

**Response to Paragraph 57**:

**The allegations in Paragraph 57 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM denies paragraph 57, and specifically denies that any payment obligations became due.**

58.     The United States sent a final demand for payment to SPG on May 24, 2021. Exhibit 15.

**Response to Paragraph 58**:

**The allegations in Paragraph 58 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM is without sufficient knowledge or information to form a belief as to the allegations not directed toward CCM and therefore denies them.**

59.     SPG breached its Payment Agreements by failing to meet its guaranty obligations, and the United States has suffered damages in the amount of $7.8 million, plus interest, penalties, fees, and costs, as applicable under 31 U.S.C. § 3717 and 31 C.F.R. § 901.9.

**Response to Paragraph 59**:

**The allegations in Paragraph 59 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM denies Paragraph 59.**

Prayer for Relief

60.     Wherefore, the United States prays for the following relief against defendant CCM:

     a.   Judgment for the damages that Energy sustained as a result of the breach of CCM's Payment Agreement;

     b.   Damages sufficient to pay CCM's guaranty obligations, plus all unpaid accrued interest, fees, penalties, and costs through the date of judgment, to the extent applicable under 31 U.S.C. § 3717 and 31 C.F.R. § 901.9;

     c.   All post-judgment interest that accrues until the obligation under CCM's Payment Agreement is satisfied; and

     d.   Such other or further relief as the Court deems just and appropriate.

**Response to Paragraph 60**:

**CCM denies that the United States is entitled to any of the requested relief, or any other form of relief.  To the extent any allegations in the Complaint are not expressly admitted above, they are denied.**

61.   Wherefore, the United States prays for the following relief against defendant SPG:
   a.   Judgment for the damages that Energy sustained as a result of the breach of SPG's Payment Agreements;
   b.   Damages sufficient to pay SPG's guaranty obligations, plus all unpaid accrued interest, fees, penalties, and costs through the date of judgment, to the extent applicable under 31 U.S.C. § 3717 and 31 C.F.R. § 901.9;
   c.   All post-judgment interest that accrues until the obligations under SPG's Payment Agreements are satisfied; and
   d.   Such other or further relief as the Court deems just and appropriate.

**Response to Paragraph 61**:

**The allegations in Paragraph 61 are not directed to CCM, and therefore no response from CCM is required.  To the extent a response is required, CCM denies Paragraph 61.**

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof where it rests on the United States, CCM alleges and avers the following separate affirmative and additional defenses to the Complaint:

### First Defense
### (Failure to Satisfy Condition Precedent)

Each of the United States' claims or causes of action is barred, in whole or in part, because the United States failed to satisfy any of the enumerated conditions precedent necessary to trigger a right to performance under the Payment Agreements.  Among other issues, there was no termination or discontinuation by STCE, and DOE discontinued for reasons other than those enumerated in the Payment Agreement.

## Second Defense
### (Estoppel)

Each of the United States' claims or causes of action is barred, in whole or in part, by the equitable doctrine of estoppel because (1) DOE made various representations to STCE and others indicating that it supported and would continue to support the project, including through its course of conduct throughout the project and specifically in November 2015, when it elected to proceed with the project; (2) STCE, CCM, and SPG reasonably relied on DOE's continued representations and course of conduct indicating that it would support the project; and (3) STCE continued to perform, and CCM and SPG continued to support the project, even after DOE secretly planned and then publicly sought to de-obligate funds from the project. Not only did DOE fail to collaborate or inform STCE, CCM, or SPG that DOE had decided to "move on," but DOE disparaged the project publicly and privately while STCE was attempting to secure financial close, making it impossible for STCE to secure financing commitments during the time allotted to STCE for achieving financial close.

## Third Defense
### (Impossibility and/or Impracticability)

Each of the United States' claims or causes of action are barred, in whole or in part, by the doctrine of impossibility and/or impracticability. DOE's conduct in electing to proceed with the project in November 2015, and then during the ensuing months, taking a series of actions that made it impossible or impracticable for STCE to achieve financial close. Those actions—taken while STCE continued its work to secure outside funding and during the period allotted for achieving the final milestone of financial close—included: (1) failing to collaborate as required by the Cooperative Agreement; (2) hiding the fact that it had decided to propose defunding the project in Congressional budget proposal; and (3) disparaging the project publicly and privately, including

in Congressional testimony by the Secretary of Energy.  It is a commercial reality that DOE's public withdrawal of support for the project—particularly by the Secretary of Energy himself— made it impossible for the project to attract private funding and interfered with STCE's performance under the Cooperative Agreement.  DOE's proposed budget cuts and public statements fueled public perception that DOE was "moving on" and that the project was no longer viable.  This conduct contravened a basic assumption that the United States would exercise normal Federal stewardship of and collaboration with respect to the project, and the absence of this stewardship and collaboration made performance impossible or impracticable.

### Fourth Defense
### (Prior Material Breach)

Each of the United States' claims or causes of action is barred, in whole or in part, because the United States materially breached the Cooperative Agreement, failing to meet its explicit obligations to collaborate and share responsibility for management of the project, exercise adequate Federal stewardship, and exercise sound project and financial management of the project. For example, DOE failed to collaborate with STCE and others after electing to proceed with the project in October 2015, failed to inform STCE or others that DOE was defunding the project in early-2016, and privately and publicly disparaged the project.  Additionally, DOE's conduct breached the implied covenant of good faith and fair dealing.  DOE therefore may not enforce its terms against another party.

### Fifth Defense
### (Unclean Hands)

Each of the United States' claims or causes of action is barred, in whole or in part, by the equitable doctrine of unclean hands because: (1) DOE made various representations to STCE and others indicating that it supported and would continue to support the project, including through its

course of conduct throughout the project and specifically in November 2015, when it elected to proceed with the project; (2) STCE, CCM, and SPG reasonably relied on DOE's continued representations and course of conduct indicating that it would support the project; and (3) STCE continued to perform, and CCM and SPG continued to support the project, even after DOE secretly planned and then publicly sought to de-obligate funds from the project.  DOE failed to collaborate or inform its partners that DOE had decided to "move on," and then, while STCE was attempting to secure financial close, disparaged the project publicly and privately, making performance impossible during the time allotted to STCE for achieving financial close.

**Sixth Defense**
**(Failure to Mitigate)**

Each of the United States' claims or causes of action is barred, in whole or in part, because of, and to the extent of, the United States' own failure to exercise sound project and financial management and normal Federal stewardship of the project, and subsequent failure to seek recovery against STCE or file a proof of claim in the STCE bankruptcy.

**Seventh Defense**
**(Impairment of Surety Status)**

Each of the United States' claims or causes of action are barred, in whole or in part, because the United States impaired the surety status in that it fundamentally increased the risk of loss by increasing the potential cost of performance and decreasing STCE's ability to bear the cost of performance.  DOE failed to collaborate or exercise normal Federal stewardship, or exercise sound project and financial management, when it elected to proceed with the project, accelerated cost-shares and project budgets, and then defunded and disparaged the project, all of which increased the risk that the Payors would bear the cost of performance.

### Eighth Defense
### (Material Modification)

Each of the United States' claims or causes of action are barred, in whole or in part, because the United States materially modified the underlying instrument, the Cooperative Agreement, and those modifications amounted to a substituted contract and/or imposed additional risks on the Payors fundamentally different from those extant prior to modification.  For example, DOE approved deadline extensions, accelerated cost-shares, increased project budgets, and modified the project to be substantially more complicated and expensive to complete after Payors entered into the payment agreements, and without involving or notifying them of these changes on an ongoing basis.  This increased the risk that Payors would bear the cost of performance to such a great extent that it discharged the Payors' obligations.

### Ninth Defense
### (Laches)

Each of the United States' claims or causes of action are barred, in whole or in part, by the equitable doctrine of laches.

### Tenth Defense
### (Statute of Limitations)

Each of the United States' claims or causes of action are barred, in whole or in part, by the applicable statute of limitations.

### Eleventh Defense
### (Failure to State a Claim)

Each of the United States' claims or causes of action are barred, in whole or in part, because the Complaint fails to state a claim or cause of action upon which relief may be granted.

### Twelfth Defense
### (Limitations on Liability)

The United States' request for interest, fees, penalties, and costs are barred, in whole or in part, by the limitations on liability provisions in the Payment Agreements.

### Thirteenth Defense
### (Waiver)

Each of the United States' claims or causes of action is barred, in whole or in part, by the equitable doctrine of waiver based on DOE's course of conduct during the project.

### Fourteenth Defense
### (Intervening Causes)

Each of the United States' claims or causes of action is barred, in whole or in part, because the alleged injuries, if any, are too remote or stemmed from intervening and/or superseding causes, including DOE's own actions undermining the project, as described above.

### Fifteenth Defense
### (Setoff/Recoupment)

Any damages claimed against CCM are subject to setoff and/or recoupment.

### Sixteenth Defense
### (Defense of Others)

CCM adopts by reference any applicable defense pleaded by any other Defendant not otherwise expressly set forth herein.

### Seventeenth Defense
### (Reservation of Other Defenses)

CCM has not knowingly or intentionally waived any applicable defenses and explicitly reserves the right to assert and rely on such other applicable defenses as may become available or apparent during further investigation and/or discovery proceedings.  CCM further reserves the

right to amend its Answer and/or its defenses accordingly, and/or to delete defenses that it determines are not applicable during the course of subsequent discovery.

## COUNTERCLAIMS

1.      Without waiving the foregoing Defenses, Counterclaim Plaintiff CCM, by counsel, asserts the following counterclaims for breach of contract, breach of the implied covenant of good faith, and impairment of surety status by Counterclaim-Defendant United States.

## INTRODUCTION

2.      CCM's counterclaims arise out of DOE's failure to uphold the contractual commitments it made for the Texas Clean Energy Project ("TCEP" or "the Project"), a first-of-its-kind, multi-billion-dollar carbon capture and storage demonstration project.

3.      In 2010, the United States ("the Government")—represented by the National Energy Technology Laboratory ("NETL") of the Department of Energy ("DOE")—entered into a "Cooperative Agreement" (DE-FE0002650) through which it partnered with Summit Texas Clean Energy ("STCE") a subsidiary of SPG, to support TCEP.

4.      Through that cooperative partnership, DOE pledged, *inter alia*: (1) that the Government would provide federal funds, sharing costs with STCE across multiple phases of the Project; and (2) that there would "be substantial involvement between DOE and [STCE]," including among other obligations that DOE would "have a substantial role in project decision-making.  This involvement includes collaboration and management of the project."  The DOE Project Manager working on the Project described it as "a prime example supporting the need for Government assistance in commercialization of 1st-of-a-kind advanced energy technology projects[.]"

5.      DOE did not meet these obligations.

6.      Instead, in late 2015 and early 2016, during the time allotted to STCE to conclude negotiations with private funders in order to achieve financial close—the last requirement before DOE would move TCEP beyond Phase 1—DOE (1) was secretly preparing a budget proposal that indicated that it intended to "deobligate $240 million from [the Clean Coal Power Initiative ("CCPI")] projects that have not yet reached financial close," *i.e.* TCEP; (2) internally instructed its staff to cease communications with TCEP during a critical period of time; and (3) undermined confidence in TCEP in a number of ways, including very publicly through Congressional testimony in which Secretary Ernest Moniz stated that "[STCE has] been unable to meet many of their key milestones" (despite the fact that only one milestone was left for Phase I, and was not yet due) and that DOE had "decided it was time to move on."

7.      STCE, SPG, and CCM were blindsided by DOE's conduct.

8.      Despite frequent communication throughout the Project, DOE not once asserted that the Project had failed to meet milestones and gave no indication that DOE was preparing to present a budget to Congress that proposed de-obligating projects that had not yet reached financial close, including TCEP.  To the contrary, only months prior DOE had affirmatively opted to proceed with the Project and had participated with STCE and other government officials in a contract signing ceremony in China for the TCEP construction contracts.

9.      DOE's public and private withdrawal of support and collaboration for the Project had devastating commercial impacts—it made it impossible for the Project to attract private funding, interfered with STCE's ability to perform under the Cooperative Agreement, and effectively killed the Project.

10.     Because of DOE's failure to abide by the express and implied terms of the Cooperative Agreement: (1) a "capstone," revolutionary clean coal electric power and chemicals

production facility was never built, (2) DOE's Cooperative Agreement partner, STCE, is in bankruptcy; (3) SPG and CCM lost tens of millions of dollars in fees and compensation for their involvement in the development of the Project, (4) SPG's and CCM's ability to secure financing was substantially impaired and they each lost business, and (5) SPG's and CCM's risk of loss under a set of 2012 Payment Agreements substantially increased to their detriment.

## PARTIES

11.     Counterclaim Plaintiff CCM is an affiliate of a Washington, D.C.-based family owned investment firm focused on commercial real estate and clean energy solutions.  CCM is a special purpose entity originally formed for the purpose of providing the repayment obligations on behalf of STCE as required by DOE.

12.     Counterclaim Defendant, is the United States of America, acting through DOE.

## JURISDICTION AND VENUE

13.     This Court has supplemental jurisdiction of these Counterclaims under 28 U.S.C. § 1367, or upon principles of pendent and ancillary jurisdiction.

14.     Venue is proper in the District of Delaware under 28 U.S.C. § 1391 because the defendants, counterclaim-plaintiffs, are incorporated in Delaware.

## FACTUAL BACKGROUND

### DOE PARTNERS WITH STCE AND PROMISES COLLABORATION ON AND SUPPORT OF THE PROJECT

15.     The Government, through DOE, established the CCPI program in 2002 to address a number of domestic and global energy issues through a series of on-going demonstrations.  As the DOE website explained,

> [t]he mission of the CCPI is to enable and accelerate the deployment of advanced technologies to ensure clean, reliable, and affordable electricity for the United States. The CCPI is a cost-shared partnership between the government and industry to develop and demonstrate advanced coal-based power generation technologies at

> the commercial scale. CCPI demonstrations address the reliability and affordability
> of the nation's electricity supply particularly from its coal-based generation.

Then-Secretary of the Department of Energy Steven Chu further explained the benefits of CCPI, noting that "[b]y harnessing the power of science and technology, we can reduce carbon emissions and create new clean energy jobs.  This investment is part of our commitment to advancing carbon capture and storage technologies to the point that widespread, affordable deployment can begin in eight to ten years[.]"

16.    On January 29, 2010, DOE, through NETL, entered into the Cooperative Agreement with STCE for TCEP—a first-of-its-kind CCPI project.  The Cooperative Agreement's objective was to "demonstrate the integration of a commercial electric power generating plant with carbon dioxide ($CO2$) capture, transport and geologic sequestration."

17.    The Cooperative Agreement established collaboration and shared responsibility between STCE and DOE.  The agreement placed responsibility for the Project on both parties, including a responsibility for DOE to "have a substantial role in project decision making," including "collaboration and management of the Project," which was to involve, among other things:

- "Collaboration with Recipient on project plans to include project management, test, and technology transfer plans and making recommendation for alternate approaches if the plans do not address critical programmatic issues[;]"

- "Collaborating with Recipient regarding technical progress and recommending alternate approaches or shifting work emphasis, if needed, to adequately address critical project and/or programmatic issues[;]"

- "Conducting semiannual program review meetings to evaluate progress with respect to project and program objectives[;]"

- "Participating in project management planning activities[;]"

- "Promoting and facilitating technology transfer activities[;]"

- "Serving as scientific/technical liaison between awardees and other program or industry staff[;]"

- "Substantial direct operational involvement or participation[;]"

- "Reviewing and concurring with ongoing technical performance to ensure that adequate progress has been obtained within the current phases authorized by DOE before work can commence on subsequent phases[;]" and

- "Exercis[ing] normal Federal stewardship in overseeing the project activities," including "providing technical assistance and/or temporary intervention in unusual circumstances to correct deficiencies which develop during the project."

18.     The Cooperative Agreement was set out in phases of work, each including decision points wherein DOE could decide to proceed with the next phase, or terminate or discontinue the Project.  The agreement described the Phase I decision point as "[t]he decision to proceed into subsequent Phases will be based on DOE's review of the technical accomplishments of the preceding work, programmatic changes and/or the availability of funding in the CCPI program."

19.     Through August 2016, DOE issued a total of 43 modifications.  The modifications provided, among other things, additional time and funding for the Project, ultimately extending the time for completing all Phase I requirements through July 14, 2016.  Extension modifications were often made unilaterally by DOE to give NETL additional days or weeks to review and approve the scope of the work and the relevant budget.

**SPG AND CCM ENTER INTO PAYMENT AGREEMENTS WITH DOE**

20.     In 2012, two modifications—modifications 14 and 15—secured repayment agreements based on accelerated reimbursements that, in the ordinary course, would have been reallocated during Phase II.  Pursuant to modification 14, STCE, DOE, and SPG collectively entered into two agreements that were incorporated into the parties' Cooperative Agreement and secured $1.8 million and $5 million, respectively, in repayment obligations.  Modification 15 incorporated three payment agreements (the "Payment Agreements") into the parties' Cooperative Agreement.  The first agreement, entered into by CCM and DOE, secured a $6 million repayment agreement (the "Collateral").  The second agreement, among STCE, Siemens Financial Services, Inc., and DOE, subordinated Siemens' claims to amounts on deposit to any of DOE's claims up to $2,415,075.  The third and final agreement increased SPG's repayment agreement from $5 million to $6 million.

21.     The Payment Agreements—which also were signed by DOE, incorporated into the parties' Cooperative Agreement, and referenced the obligations of the Cooperative Agreement— obligate SPG and CCM only under expressly enumerated provisions under the Payment Agreements.  As relevant here, SPG's agreements state: "Payor agrees to make payment . . . in the event the Cooperative Agreement . . . is discontinued by DOE pursuant to the Decision Point Application Process for failure to achieve the technical objectives for Phase 1."  CCM's agreement states that:

> Payor agrees to direct the disbursement of funds . . . in the event the Cooperative Agreement . . . is discontinued by DOE pursuant to the Decision Point Application Process for failure to achieve the technical objectives for Phase 1, provided that STCE shall be afforded the right to appeal or seek hearing of such final determination as permitted by 10 CDR 600.22 and 600.353[.]

Under CCM's Payment Agreement, if its payment obligation were triggered, CCM would owe a portion of the Collateral it posted sufficient to pay down STCE's obligation to DOE "provided any and all other funds otherwise available to STCE for the purposes of making such payment are not sufficient to pay" the outstanding obligation.

22.     On or about March 5, 2012, pursuant to its Payment Agreement, CCM placed $6 million, the Collateral, into a segregated account.

### DOE AND STCE SIGNIFICANTLY MODIFY THE PROJECT

23.     In 2014, DOE and STCE agreed to an overhaul of the Project after both decided the Project, as designed, was likely too expensive to be commercially viable.  The overhaul revised the design configuration and made changes to the front-end engineering and design, as well as the proposed contracts.  These changes significantly modified the Project.

24.     What is more, TCEP was part of the U.S.-China Climate Change Working Group's [Carbon Capture, Utilization, and Storage ("CCUS")] Initiative, and the overhaul was an opportunity for STCE and DOE to jointly pursue Chinese participation and financing.

25.     This also made the Project more complicated.  As noted by the DOE TCEP Project Manager, "International collaboration and partnerships bring additional complications and nuance; this is magnified when government-to-government interactions are also involved or may be helpful."

26.     On July 3, 2014, DOE Assistant Secretary Christopher Smith wrote to the Deputy Administrator of China's National Energy Administration that "the United States and China share an interest in reducing greenhouse gas emissions to limit the risks posed by global climate change. … Today, I am writing to seek your support for one of the premier carbon capture, utilization, and storage (CCUS) demonstration projects in the United States."  The letter went on to say that: "Thus

far, Export-Import Bank of China has agreed to provide additional project finance. …   [A] subsidiary of the China National Petroleum Corporation will provide the engineering services. TCEP has also been proposed as a counter-facing project for the Huaneng GreenGen Phase 2 Project under the U.S.-China Climate Change Working Group CCUS initiative. … I hope that The National Energy Administration will welcome this collaborative partnership. … I look forward to our mutual support for this project ….."

27.     On July 7, 2014, DOE released Siemen's $2,415,075 security through modification 25.

28.     In 2014, modifications issued during performance divided Phase I's requirements into subphases.  Modification 28, issued on October 7, 2014, established sub-phases 1C and 1D, and noted that sub-phases 1A and 1B were complete.

29.     By September 15, 2015, STCE had, among other development activities, (1) developed a detailed project management plan; (2) completed the Front End Engineering Design ("FEED") study; (3) filed for the necessary permits and completed the required National Environmental Policy ("NEPA") work; (4) filed for a generation interconnection request for electrical transmission of the power generated by the Project; (5) secured long-term contracts for the supply of non-potable water and coal to operate the Project; and (6) secured off-takers for the energy produced and resulting compounds.

30.     At a conference dated October 5-8, 2015, a DOE Project Manager on TCEP highlighted the need for government support on the Project's next steps, due to the Project's increasing complexity and the government interests involved.  That DOE Project Manager presented a paper, entitled "Clean Coal Power Initiative Update: Texas Clean Energy Project, 400 MW Integrated Gasification Combined Cycle Poly-Generation with 90 Percent Carbon Capture,"

that detailed the challenges of TCEP he then perceived.  The DOE Project Manager specifically highlighted that Government cooperation and support for the Project—including in financing—*were crucial* for the remaining steps, noting:

> The challenges that STCE and the TCEP have faced during the definition and development phase of the project are emblematic of why such project are of interest to the U.S. Government; reinforcing the need for government involvement through taking on a substantive portion of the financial risks inherent to demonstrating the commercial efficacy of first-of-a-kind commercial-scale demonstration projects. . . [T]he prospects without Federal assistance would not be as attractive.

### DOE ELECTS TO PROCEED IN FALL 2015

31.     Modification 34, issued on September 15, 2015, indicated that Phases 1A, 1B, and 1C were complete, with only 1D—Closing on Construction Financing—outstanding.

32.     The only remaining requirements to complete Phase I, which had approximately 50 technical objectives, were to execute the construction contracts (then, under final negotiation and ultimately executed in December 2015), which would, in turn, allow the Project to proceed to obtain commitments for financing the Project beyond Phase I—*i.e.* financial closing.

33.     The financing for the Project was to include a mix of public and private funds, as it had throughout Phase I and as all parties recognized was crucial for the success of the Project.

34.     On October 18, 2015, representatives from STCE and DOE met to agree on a strategy for financial close and a path forward which required additional time and final development funding-support from DOE to ensure that the Project could be brought to financial close.  At DOE's direction, STCE made two separate budget requests: (i) a continuation budget; and (ii) a closing/value engineering budget.

35.     At the October 18, 2015 meeting, STCE made clear that both the entire amount of additional funding and the additional time were necessary to secure financial close and that a large portion of the additional funding would be used to fund value engineering efforts that would

usually be performed during a project's construction phase, *i.e.*, Phase II.  By performing the value engineering before construction, TCEP intended to lock in a substantial portion of the construction costs at the front-end and mitigate the risk of construction cost escalation, which had plagued other contemporary large-scale CCUS projects.  This was of great interest to expected investors.

36.     Also at the October 18, 2015 meeting, STCE told DOE that it would be willing to end the Project, even after expending significant amounts of its own resources, and that it was up to DOE whether to continue.

37.     After consideration, DOE decided not to end the Project, and elected to proceed to financial close.  DOE partially funded STCE's request for a continuation budget, which it memorialized in modification 35 to the parties' agreement, dated November 16, 2015.  Modification 35 added an additional $713,533 to Phase I, $142,707 of which was funded by STCE.  Modification 36, issued on December 7, 2015, added the full amount of the first budget request.

38.     In December 2015, DOE sent representatives to attend the formal signing ceremony for TCEP's primary construction contract which took place in Beijing.  In addition to the Project's construction partners and other key stakeholders, including potential equity investors, seven U.S. government officials (three from DOE) attended.  In light of this progress, at a December meeting with DOE, STCE was instructed to refresh the plan to closing based on the final construction contract and to submit a revised closing budget (part (ii) of the original October request) in January 2016.

39.     STCE also continued its efforts to secure financing.  Starting in October 2015, STCE traveled to China a total of six times to meet with the Export-Import Bank of China ("Chexim") and its Chinese construction partner (who had partnered with the Canadian firm SNC Lavalin for TCEP's construction), China Huanqiu Contracting & Engineering Corporation

("HQC") in support of securing Chexim bank financing for financial close.  Starting in the summer of 2015 and continuing through December, Chexim's advisors conducted the bank's typical diligence review.  In addition to working with Chexim, STCE, pursuant to DOE's suggestion, applied for DOE loan guarantee program in January 2016 and received DOE's approval to move to the next application phase in late February 2016.  STCE also met with potential equity investors, including Air Products in December 2015 and Google and the capital group of SNC-Lavalin in February 2016.

40.    DOE partnership and support of the Project was key to developing financing interest and this was a discussion point with potential investors.

41.    This was especially true with respect to investment commitments by Chinese government entities.  Following Assistant Secretary of Fossil Energy Christopher Smith's July 3, 2014, letter to his Chinese counterpart—in which he wrote that "TCEP is a key part of the U.S. CCUS portfolio, and DOE has invested $450 million into the project"—senior DOE staff met with senior staff at Chexim in Beijing to discuss Chexim's support of the Texas Clean Energy Project. After this meeting, the bank began to engage DOE directly on diligence questions.  On June 24, 2015, Secretary Moniz met with the head of Chexim, Madame Hu Xiaolian to discuss TCEP as part of the Strategic & Economic Development meetings hosted in Washington that year.  DOE's advocacy on behalf of TCEP was necessary to secure Chexim's involvement in the Project.

## DOE'S WITHDRAWAL OF SUPPORT BLINDSIDES ITS PARTNERS AND KILLS THE PROJECT

42.    In early 2016, without prior warning to STCE, CCM, or SPG, DOE abruptly discontinued its collaboration and support for TCEP.  In February 2016, the Department issued its proposed Fiscal Year 2017 budget, which proposed to "deobligate $240 million from CCPI projects that have not yet reached financial close and repurpose those funds to support the FY2017

R&D portfolio[.]"  STCE, CCM, and SPG had no advance warning, no opportunity to advocate against de-obligation of funding, no opportunity to prepare contingency plans to replace DOE funding, and no opportunity to prepare stakeholders or potential investors.  The decision was widely reported, and widely understood, to be a death knell for TCEP.

43.     At the same time the proposed budget was published, NETL suspended its regularly scheduled calls with STCE per an instruction from DOE leadership not to have any communications with STCE.  STCE was cut off for weeks, and during this critical time NETL did not respond to requests for assistance in providing information to interested investors, significantly derailing any progress towards securing financial close.

44.     Nonetheless, STCE met with DOE on February 19, 2016, to attempt to get DOE to change its mind and to emphasize the progress STCE had made since DOE approved the first tranche of funding via modifications 35 and 36.  At that meeting, DOE made clear, for the first time to STCE, that the agency had discontinued its support for the Project, and that STCE could not rely on any additional financial support from DOE.

45.     On February 29, 2016, SPG wrote to DOE to inform them that achieving financial close would be impossible without U.S. Government support and funding, noting "we see no viable path to financial closure without your continued participation . . . . Financial participation from the DOE in this final phase is required for success."  SPG went on to note that "[w]e need your continued participation and partnership to reach the finish line, and respectfully request that you reverse your decision to discontinue support[.]"

46.     Instead of reversing course, DOE went further.  On March 3, 2016, then Secretary Moniz testified before Congress that $240 million would be de-obligated from projects like TCEP to be used as "new" money, disconnected from existing projects.

47.     On March 22, 2016, then Secretary Ernest Moniz testified before Congress that TCEP had not met critical milestones—despite the fact that the mutually-agreed Phase I milestone deadline at that time was not until May 13, 2016 (and was later extended), and that only one (out of fifty) objective remained—and that DOE had decided to "move on."  DOE had not, however, communicated to STCE either its belief that TCEP had not met critical milestones nor its intent to "move on"—i.e. discontinue the Project—despite weekly meetings with NETL, regular updates and communications with DOE leadership, and DOE's obligation to collaborate.

48.     DOE's public statements and acts signaled to the public and financial markets that the Department had officially discontinued its support for the Project.  This eliminated all remaining prospects for reaching financial close in advance of the Phase I milestone deadline.

49.     As one example, prior to DOE's public statements discontinuing the Project, STCE and SNC Lavalin set a meeting to discuss SNC Lavalin's investment in TCEP.  After DOE's testimony, on March 31, 2016, SNC Lavalin instead wrote to STCE noting that it no longer had sufficient confidence in the Project to move forward and that it was demanding all outstanding payments:

> We note from the Congressional Hearing: [] Letters of record indicate that the DOE funding for the Project was repurposed on February 9, 2016.
> . . .
> All of the above casts serious doubt on the viability for the Estimate Phase of the Project and the Project as a whole. . . . We have no other option but to suspend all work performed under the Letter Agreement or the Task Orders pending satisfactory resolution of the payment issues.

50.     Multiple news articles were published at roughly the same time concerning DOE's defunding, for a project that previously received only positive press, showing the public perception that the Project was officially dead.  Chexim's involvement also ceased after DOE withdrew its support.

51.     In April 2016, DOE's Office of Inspector General issued a report that expressed significant concerns about DOE's management of the Project and the viability of the Project.

52.     And on May 11, 2016, months before the expiration of the Phase I deadline, Assistant Secretary Chris Smith testified before Congress that STCE had not met milestones put in place regarding project financing.  Again, DOE had not communicated that to STCE, and the period for performance had not passed.

53.     DOE never provided the full funding requested by STCE during the October 18, 2015 meeting, as updated in the January 2016 budget proposal submitted at DOE's request, nor did it ever change its public position on TCEP.

### DOE FORMALIZES ITS DISCONTINUATION OF TCEP
### AND PURSUES RECOVERY FROM SPG AND CCM

54.     A series of additional modifications from January to June 2016—37 through 42—extended the Cooperative Agreement until July 14, 2016 but did not provide further funding or support.

55.     On August 23, 2016, DOE issued a letter stating that DOE was "discontinuing funding under this award for all activities other than those associated with an orderly closeout of the project."

56.     On September 23, 2016, STCE, SPG, and CCM submitted an appeal to DOE's Senior Procurement Executive ("SPE") that challenged DOE's decision to discontinue the parties' Cooperative Agreement.

57.     On December 20, 2016, the SPE declined to review the appeal and made no findings on the merits.

58.     On or around December 22, 2016, DOE demanded a payment of $13.8 million from STCE, SPG, and CCM, collectively, based on accelerated reimbursements.

59.     STCE filed for bankruptcy in October 2017, as a result of DOE's payment demands.

60.     DOE did not file a proof of claim in the STCE bankruptcy proceedings and instead solely sought payment from CCM and SPG.

61.     CCM incurred significant damages as a result of DOE's actions.  Indeed, had the Project reached financial close, CCM and its affiliates would have been entitled to tens of millions of dollars in fees and compensation for its involvement in the development of the Project.  These fees were vetted by DOE and formalized in various agreements.  CCM would have also received payment from SPG as an investor in SPG had SPG received payment from the Project as stipulated therein.

62.     Subject to the Payment Agreement, CCM deposited the $6 million collateral in a segregated deposit in 2012, and has been unable to utilize those funds for its primary business purpose—investment in real estate and clean energy solutions.  That segregation of funds has resulted in significant losses to CCM.  That segregation of funds and the loss of the fees and compensation anticipated for its involvement in the development of the Project has resulted in significant losses to CCM.

### CLAIMS FOR RELIEF

### COUNT I
**Breach of Contract**

63.     Paragraphs 1 through 62 are hereby incorporated by reference as if set forth in full.

64.     The Cooperative Agreement, referenced and incorporated into the Payment Agreements, required DOE to "collaborat[e] with Recipient regarding technical progress and recommending alternate approaches or shifting work emphasis, if needed, to adequately address critical project and/or programmatic issues," among other duties.  DOE breached its collaboration and support requirements by, among other things (1) failing to timely disclose to STCE, SPG or

CCM its intent to defund and discontinue the Project; (2) without notice to STCE, and after telling STCE to proceed with efforts to reach financial close, proposing to deobligate $240 million from CCUS projects, including TCEP, when it knew that the $240 million was critical to TCEP's financing; (3) cutting off STCE from DOE support during the critical weeks after DOE submitted its proposed budget; (4) discontinuing its support for the Project in advance of the deadline DOE had set for reaching financial close and completing Phase I; (5) dissuading potential investors from funding the Project by publicly announcing its decision to discontinue support for TCEP in advance of the Phase I deadline; (6) undermining STCE's efforts to secure funding by disparaging the Project in Congressional testimony and private discussions with lawmakers; and (7) taking other damaging actions toward the Project.

65.     DOE's material breach of the parties' agreement caused STCE to be unable to reach the final Phase I requirement, financial close.

66.     As a direct result of DOE's breach of contract, CCM has suffered, at least, $23.4 million in damages.

## COUNT II
### Breach of the Implied Duty of Good Faith and Fair Dealing

67.     Paragraphs 1 through 62 are hereby incorporated by reference as if set forth in full.

68.     Like all other agreements, the Cooperative Agreement, into which the Payment Agreements were incorporated, contains an implied covenant of good faith and fair dealing, pursuant to which the Government has a duty to perform its obligations under the parties' Cooperative Agreement in good faith and not to take actions detrimental to the rights of STCE, CCM, and SPG. DOE breached the covenant of good faith and fair dealing by (1) failing to timely disclose to STCE, SPG or CCM its intent to defund and discontinue the Project; (2) without notice to STCE, and after telling STCE to proceed with efforts to reach financial close, proposing to

deobligate $240 million from CCUS projects, including TCEP, when it knew that the $240 million was critical to TCEP's financing; (3) cutting off STCE from DOE support during the critical weeks after DOE submitted its proposed budget; (4) discontinuing its support for the Project in advance of the deadline DOE had set for reaching financial close and completing Phase I; (5) dissuading potential investors from funding the Project by publicly announcing its decision to discontinue support for TCEP in advance of the Phase I deadline; (6) undermining STCE's efforts to secure funding by disparaging the Project in Congressional testimony and private discussions with lawmakers; and (7) taking other damaging actions toward the Project.

69.     DOE's material breach of the parties' agreement caused STCE to be unable to reach the final Phase I requirement, financial close.

70.     As a direct result of DOE's breach of the implied duty of good faith and fair dealing, CCM has suffered, at least, $23.4 million in damages.

<u>COUNT III</u>
**DOE Impaired CCM's Surety Status**

71.     Paragraphs 1 through 62 are hereby incorporated by reference as if set forth in full.

72.     After the Payment Agreement was entered, and CCM placed the collateral funds into an account, DOE, through various actions and modifications to the Project, imposed risks of loss on CCM that were fundamentally different from those imposed on CCM prior to the modifications and actions and should have discharged CCM's duties with respect to performance. This included, at a minimum: (1) DOE's substantive modifications and other significant changes to TCEP, (2) DOE's poor management of the Project as described in DOE Inspector General Report, (3) DOE's actions that made it impossible for STCE to reach the only remaining Phase I requirement, *i.e.*, financial close, and (4) DOE's failure to make claims against STCE's assets in bankruptcy.

48

73.     As a direct result of DOE's actions, CCM has suffered, at least, $23.4 million in damages.

## PRAYER FOR RELIEF

WHEREFORE, CCM respectfully requests that the Court grant the following relief:

1.     Dismissing Plaintiff's and Counterclaim-Defendant's Complaint in its entirety;

2.     Awarding the damages incurred by CCM caused by Counterclaim-Defendants' breach of contract and relevant covenants;

3.     Awarding costs and litigation expenses, including reasonable attorneys' fees; and

4.     Granting such other and further relief as the Court may deem just and equitable.



MORRIS, NICHOLS, ARSHT & TUNNEL LLP


*/s/ Alexandra M. Cumings*
Kenneth J. Nachbar (#2067)
Alexandra M. Cumings (#6146)
1201 North Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@morrisnichols.com
acumings@morrisnichols.com

*Attorneys for Defendant CCM TCEP, LLC*


December 17, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on December 17, 2021, upon the following in the manner indicated:

John Robert Kresse, Esquire                          *VIA ELECTRONIC MAIL*
Tiffiney Carney, Esquire
United States Department of Justice
Civil Division, Commercial Litigation Branch
100 L St NW
Washington, DC 20005
*Attorneys for Plaintiff*

David C. Weiss, Esquire                               *VIA ELECTRONIC MAIL*
United States Department of Justice
Civil Division, Commercial Litigation Branch
Hercules Building
1313 N. Market Street
P.O. Box 2046
Wilmington, DE 19801
*Attorney for Plaintiff*


*/s/ Alexandra M. Cumings*
_____
Alexandra M. Cumings (#6146)