IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) C.A. No. 21-1461-TMH |
| CCM TCEP, LLC, and SUMMIT POWER GROUP, LLC, | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Brian Boynton, Acting Assistant Attorney General, Washington, DC; David C. Weiss, United States Attorney for the District of Delaware, Wilmington, DE; Ruth A. Harvey, Michael J. Quinn, John R. Kresse, Tiffiney Carney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC – Attorneys for Plaintiff.

Michael J. Gottlieb, Martin J. Weinstein, WILLKIE FARR & GALLAGHER LLP, Washington, DC – Attorneys for Defendant CCM TCEP, LLC.

Natalia T. Sorgente, Adam Dec, BAKER BOTTS, L.L.P., Washington, DC; Kenneth J. Nachbar, Alexandra M. Cumings, MORRIS NICHOLS ARSHT & TUNNELL, Wilmington, DE – Attorneys for Defendants CCM TCEP, LLC and Summit Power Group, LLC.

July 14, 2022
Wilmington, DE

**HUGHES, UNITED STATES CIRCUIT JUDGE, SITTING BY DESIGNATION:**

Pending before me is Plaintiff United States' motion to dismiss Defendants CCM TCEP, LLC and Summit Power Group, LLC's counterclaims. Because CCM and Summit Power Group do not have standing to bring their counterclaims, I grant the United States' motion to dismiss.

**I.     BACKGROUND**[1]

In 2002, the United States started a Clean Coal Power Initiative to subsidize clean-energy projects. ECF No. 10, at 3–4 (*CCM Answer*).[2] On January 29, 2010, the Department of Energy (Energy) and Summit Texas Clean Energy, LLC (Summit) entered into a Cooperative Agreement "to build a facility that would capture and sequester, or otherwise put to beneficial use, 90 percent of the carbon dioxide generated by a coal-fired power plant." *Id.* at 5–6. Under the Cooperative Agreement, Energy would conditionally subsidize $350 million of the $1.726 billion project, dividing and distributing the subsidy among four phases of the project. *Id.* at 7–8; ECF No. 1 (*Complaint*), Ex. 1, at 7. Energy committed $15 million of the $350 million subsidy for the first phase. *Complaint*, Ex. 1, at 7.

---

[1] For purposes of this motion to dismiss, I adopt CCM and SPG's allegations as true. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

[2] CCM and SPG separately responded to the United States' complaint. ECF No. 10 (CCM's Answer); ECF No. 11 (SPG's Answer). Because their responses are substantially identical, I cite to only CCM's answer. For the same reason, I cite to only the United States' opening brief that is directed to CCM. *See* ECF No. 20 (moving to dismiss CCM's counterclaims); ECF No. 21 (moving to dismiss SPG's counterclaims).

2

Energy amended the Cooperative Agreement several times to extend the first-phase deadline and to give Summit accelerated first-phase funding that Summit would have to repay if the parties terminated or discontinued the project. *Id.* at 12, 14. With the extended deadline approaching, Energy was allegedly "concerned that Summit could not meet its obligation—if the project ended—to repay" the accelerated funding, which had reached $16 million. *Complaint*, at 6. Energy agreed to further extend the first-phase deadline if Summit would secure repayment via third party guarantors. *CCM Answer*, at 13–15. Accordingly, Summit engaged CCM TCEP, LLC and Summit Power Group, LLC (SPG)—the defendants in the present action—"to enter into separate guaranties, each titled a 'Payment Agreement.'" *Id.* at 14.

Under CCM's Payment Agreement, CCM would commit to a collateral account $6 million that would issue to Energy if Energy or Summit discontinued the Cooperative Agreement. *Complaint*, Ex. 3, at 1. And under SPG's two Payment Agreements, SPG would commit a total of $7.8 million. *Complaint*, Ex. 4, at 1; *Complaint*, Ex. 5, at 1.

Energy continued to extend the deadline for Summit to complete the first phase of the project and continued to supply Summit with additional first-phase funding. *CCM Answer*, at 16–17, 36. By September 2015, Summit had nearly finished the first phase, needing only to execute construction contracts. *Id.* at 40. Summit requested additional funding and time to finish this last step, but also told Energy that it "would be willing to end the Project." *Id.* at 40–41. Energy chose to proceed.

*Id.* at 41. By the end of 2015, Energy had given Summit $104 million to fund the first phase of the project. *Id.* at 17.

"In early 2016, without prior warning," Energy "abruptly discontinued its collaboration and support for" the project, proposed to deobligate money from Clean Coal Power Initiative projects that had not reached financial close, *id.* at 42–43, and "internally instructed its staff to cease communications with" participants of the Texas Clean Energy Project, *id.* at 33. Summit wrote to Energy to try to convince it not to deobligate funds and informed Energy "that achieving financial close would be impossible without [g]overnment support and funding." *Id.* at 43. On March 22, 2016, the then-Secretary of Energy testified before Congress that Summit had not met its milestones. *Id.* at 33, 44. On June 10, 2016, Energy notified the parties that it intended to discontinue the Cooperative Agreement, which it did on August 23, 2016. *Id.* at 18–19; *Complaint*, Ex. 9. The defendants characterize Energy's actions as a "public and private withdrawal of support and collaboration," *CCM Answer*, at 44, that "had devastating commercial impacts," *id.* at 33.

Summit has since filed for bankruptcy and has not repaid the $13.8 million guaranteed by CCM and SPG. *Id.* at 20. The United States sued CCM and SPG for the $13.8 million allegedly owed. *Complaint*, at 9–10. CCM and SPG countersued, arguing that Energy had breached the Cooperative Agreement, breached the implied duty of good faith and fair dealing, and impaired CCM's and SPG's surety statuses. *CCM Answer*, at 46–48. The United States moves to dismiss CCM and SPG's

4

counterclaims under Federal Rules of Civil Procedure 12(b)(1) and (6). ECF No. 20, at 1.

This court has subject matter jurisdiction over the United States' claims under 28 U.S.C. § 1345, and venue is proper because the defendants are incorporated in Delaware. *See CCM Answer*, at 2–3.

## II. LEGAL STANDARD

Federal law typically governs contracts with the government, *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1298 (Fed. Cir. 1986), and the Payment Agreements specifically provide that they are governed by federal law, *e.g.*, *Complaint*, Ex. 3, at 5. Under federal law, a party has standing if it is in privity of contract with the government or is a third-party beneficiary to a government contract. *Sullivan v. United States*, 625 F.3d 1378, 1379–80 (Fed. Cir. 2010); *see Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288 (3d Cir. 2002) ("[O]ur jurisprudence recognizes third-party standing under certain circumstances.").

To establish third-party-beneficiary status, "a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Flexfab, LLC v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (citation omitted). Third-party-beneficiary status is an "exceptional privilege" that arises only if the contract "clearly intend[s] to . . . benefit" a third party. *Id.* at 1259–60 (citations omitted).

### III. DISCUSSION

#### A. Cooperative Agreement

The government argues that the defendants do not have standing to sue under the Cooperative Agreement because they are not parties to that agreement. ECF No. 20, at 12. The defendants assert that they are parties to the Cooperative Agreement because the Cooperative and Payment Agreements incorporate each other. ECF No. 24, at 17. The government rejects this assertion, arguing that "a guaranty is a derivative liability that does not make one a party to the underlying agreement and does not give standing to sue." ECF No. 27, at 9.

The defendants are not in privity with the government as to the Cooperative Agreement. The Cooperative Agreement identifies points of contact for only Energy and Summit and says that the contract was "awarded to" Summit, indicating that Energy and Summit are the only parties to the original agreement. *Complaint*, Ex. 1, at 3. And the incorporation of the Payment Agreements into the Cooperative Agreement does not add to or otherwise modify the parties in the Cooperative Agreement. The Payment Agreements explicitly recognize that only Summit and Energy are parties to the Cooperative Agreement. *E.g.*, *Complaint*, Ex. 3, at 1 ("WHEREAS, STCE and DOE are parties to . . . the 'Cooperative Agreement'."). And the modification to the Cooperative Agreement that incorporates the Payment Agreements states that its purpose is only "to recognize and incorporate certain tranches of security . . . with respect to the potential repayment of certain accelerated reimbursement payments" and that "ALL OTHER TERMS AND CONDITIONS

6

REMAIN UNCHANGED." *Complaint*, Ex. 6, at 3; *Complaint*, Ex. 7, at 3–4. Because the Cooperative Agreement is between only Energy and Summit, and because the Payment Agreements did not amend the Cooperative Agreement to make CCM or SPG parties, the defendants are not in privity with the government as to the Cooperative Agreement.

The defendants argue in the alternative that they are, at the very least, third-party beneficiaries of the Cooperative Agreement because the government and Summit intended for the defendants to benefit from that agreement. ECF No. 24, at 18–19. The government disagrees, asserting that the defendants, in their answers to the government's complaint, "do[] not even allege that [they are] the intended third-party beneficiar[ies] of the Cooperative Agreement," and that "the indisputable nature of the Cooperative Agreement . . . does not express any intent to benefit [the defendants] directly." ECF No. 20, at 12–13.

The defendants are not third-party beneficiaries of the Cooperative Agreement. The Cooperative Agreement does not explicitly name any third-party beneficiaries, so the agreement must imply an intention to directly benefit the defendants for the defendants to obtain third-party-beneficiary status. *Flexfab*, 424 F.3d at 1259–60. It does not. As shown by *Mid-State Fertilizer v. Exchange National Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989) and *Bank of America, FSB v. United States*, 55 Fed. Cl. 670 (2003), merely serving as guarantor does not give rise to third-party-beneficiary status.

7

In *Mid-State Fertilizer*, Mid-State Fertilizer contracted with the Exchange National Bank of Chicago for credit. 877 F.2d at 1333. Lasley and Maxine Kimmel served as guarantors to Mid-State Fertilizer's obligations under that contract. *Id.* at 1334. The Seventh Circuit determined that the Kimmels did not have standing to sue the Bank for "violat[ing] statutory and contractual duties owed to Mid-State" Fertilizer. *Id.* at 1336.

The Seventh Circuit reasoned that allowing the Kimmels to sue under the original contract between Mid-State Fertilizer and the Bank could lead to a double counting of damages. *Id.* at 1335–36. Analogizing to investors, the court explained that "[a] fire that causes $100 worth of damage to 'the corporation', and therefore reduces the value of investors' stock by $100, does not cause a total injury of $200—the net loss is $100, and everyone is made whole by an award of the sum to the firm." *Id.* at 1336. Likewise, the Kimmels did not need to recover separately because "[r]ecovery by Mid-State [Fertilizer] would put the Kimmels in the position they would have occupied had [the Bank] lived up to its promises." *Id.* The Seventh Circuit concluded that the Kimmels, as guarantors, did not have standing to sue. *Id.*

The same concern arises here: The defendants countersue Energy for allegedly breaching its obligations under the Cooperative Agreement and damaging the defendants' surety statuses. *CCM Answer*, at 46–49. They request $23.4 million in damages because, "had the Project reached financial close, [the defendants] would have been entitled to tens of millions of dollars in fees and compensation for [their] involvement in the development of the Project." *Id.* at 46. If Summit were to

successfully sue Energy for breach of the Cooperative Agreement, then a portion of the damages that Summit would recover would presumably make its way to the defendants, placing them in the position they would have occupied had Energy lived up to its promises. To allow the defendants—rather than Summit—to affirmatively assert these claims would risk double counting damages, as cautioned by *Mid-State Fertilizer*. The parties have not suggested that Summit's current bankrupt status affects this general rule.

In *Bank of America*, Bank of America and investors of H.F. Holdings, Inc. sued H.F. Holdings for breach of contract. 55 Fed. Cl. at 671. The Court of Federal Claims determined that the investors did not have standing to sue the Bank. *Id.* at 679. The court first recognized that the investors had guaranteed the contract between Bank of America and H.F. Holdings. *Id.* at 676–77. But the court found that "the investors, in their dealings with the Bank Board, were not speaking for themselves but rather for their wholly owned corporation," H.F. Holdings. *Id.* at 677. The investors' guarantee of $2.5 million "served only as a backup to [H.F. Holdings'] own promise to provide such support." *Id.* The agreement's language was particularly probative: "The undersigned, constituting the sole stockholders of [H.F. Holdings], jointly and severally, guarantee *the obligation of* [*H.F. Holdings*] set forth in the third paragraph hereof." *Id.*

The Court of Federal Claims concluded that "the record contains no documents that would allow the court to declare that despite the secondary character of their obligation, the investors' participation as guarantors was intended to invest them

9

with the status of contract parties." *Id.* at 678. So the court determined that the investors' "rights and obligations are therefore limited to the scope of their guarantee." *Id.* The Court of Federal Claims also explicitly rejected the investors' argument that they were third-party beneficiaries, saying "the essential contract document . . . is bereft of any language demonstrating an intention to confer a benefit upon the investors." *Id.*

The contracts in this case are similar to those in *Bank of America*. The Payment Agreements explicitly say that "Payor is willing to deposit the Credit Amount in support of [*Summit*]*'s obligations.*" *E.g.*, *Complaint*, Ex. 3, at 1 (emphasis added). The language in these agreements indicates that the defendants' guarantees served only as backups to Summit's obligation. And the Cooperative Agreement does not directly benefit the defendants, nor does it show that Energy or Summit intended to benefit the defendants. The defendants' rights and obligations are limited to the scope of the Payment Agreements, which do not give either defendant the affirmative right to sue for breach of the Cooperative Agreement or other derivative claims. Therefore, the defendants have not shown that they qualify for the exceptional privilege of third-party-beneficiary status as to the Cooperative Agreement.

B. <u>Payment Agreements</u>

Although the parties are in privity as to the Payment Agreements, the defendants do not have standing to bring their counterclaims under these agreements because the Payment Agreements do not grant the defendants the right to sue Energy for claims relating to the Cooperative Agreement. Rather, if defendants can assert

their claims in any form, they can likely raise them as affirmative defenses, as the defendants have already done in their answers.

The defendants argue that they have standing to bring their claims under the Payment Agreements because the defendants and the government are parties to those agreements and because the defendants' claims are rooted in those agreements. ECF No. 24, at 16–17. "[A] contract includes[] not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made." *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 329 (1927). The Payment Agreements require the defendants to disburse funds if Energy discontinues the project "for failure to achieve the technical objectives for Phase 1," which are governed by the Cooperative Agreement. *E.g.*, *Complaint*, Ex. 3, at 2. So, the defendants argue, the Payment Agreements imply that Energy is obligated "to abide by the terms of the Cooperative Agreement, not to breach that agreement, and to act in good faith in any such discontinuation decision," and the defendants assert that they can sue Energy if it contravenes these obligations. ECF No. 24, at 18. Otherwise, Energy "could simply breach the Cooperati[ve] Agreement without merit or in bad faith," and the defendants would have no recourse. *Id.*

The government responds that "the Payment Agreements evidence no expectation by Energy or defendants that the guarantors, CCM and SPG, would be

11

entitled to damages if Energy breached the underlying Cooperative Agreement." ECF No. 27, at 9.

The defendants are in privity with the government as to the Payment Agreements because those agreements list CCM and SPG as parties. *Complaint*, Ex. 6, at 4. But CCM and SPG do not have standing to assert affirmative counterclaims under the Cooperative Agreement just because they are parties to the Payment Agreements. The Payment Agreements set forth limited rights for Energy—to receive collateral if Energy or Summit terminate or discontinue the Cooperative Agreement—and limited rights for the defendants—to exercise voting power pertaining to the collateral and to withdraw specified interest that the collateral accrues. *E.g.*, *Complaint*, Ex. 3, at 2–4. The Payment Agreements do not explicitly or implicitly grant the defendants the right to sue the government if Energy were to breach the Cooperative Agreement, which is an entirely separate contract to which the defendants are not parties. Therefore, the defendants do not have standing under the Payment Agreements to bring their counterclaims.

This does not mean that the defendants are without recourse if the government has breached the Cooperative Agreement. Though the defendants "may not use that agreement as a basis to seek counterclaim damages," they might, as the government recognizes, "be entitled to assert any contractual defenses that were available to Summit under the Cooperative Agreement." ECF No. 20, at 14. And the defendants have done exactly that, raising their breach of contract, breach of the implied duty of

12

good faith and fair dealing, and impairment of surety claims as affirmative defenses. *CCM Answer*, at 28–29.

## IV. <u>CONCLUSION</u>

Because the defendants do not have standing to bring their counterclaims, I grant the government's motion to dismiss for lack of standing. I do not address the parties' other arguments regarding Federal Rules of Civil Procedure 12(b)(1) and (6).